THE STATE ex rel. CARROLLTON SCHOOL DISTRICT v. JOHN P. GORDON, State Auditor.

In Banc, December 17, 1910.

1. **MANDAMUS: Pleading.** In strict practice, issues of fact or law are framed on the narrations of the alternative writ in mandamus and a return raising questions of law or fact; but as the alternative writ follows the petition, the waiving of such writ is permitted to be equivalent to treating the petition as and for the writ, and, in such event, an issue of law on the petition itself may be raised by demurrer.

2. **PUBLIC BONDS: Negotiation and Sale Before Registration.**
An effort to agree upon a price for public school bonds before
registration does not authorize the State Auditor to deny them
registration. They are neither sold nor negotiated until de-
livered. The statute in saying that "before any bond shall
obtain validity or be negotiated such bond shall be presented
to the State Auditor" for registration, means, by the use of
the word "negotiated," the assignment or transfer by delivery,
and does not prevent a preliminary agreement or a bargain
looking to complete delivery.

3. ———: **Doubleness in Proposition: Constitutional Inhibi-
tion As Rule of Construction.** The vote of the people of a school
district on a proposition to issue bonds stands in the nature
of a legislative act, and a successful vote thereon is in the
nature of the adoption of a law, and therefore the method of
its adoption is within the principle of the constitutional pro-
vision controlling legislation. The rule of the Constitution
declaring that "no bill shall contain more than one subject,
which shall be clearly expressed in its title," is applicable in de-
termining whether the proposition submitted to the people and
determined by one vote was double or single, and the propo-
sition submitted to the people should be as liberally construed
as the title and subject of the legislative act. [Following
State ex rel. Memphis School District v. Gordon, 223 Mo. 1.]

4. ———: ———: **School District.** Doubleness in a proposition
having as its aim and purpose the establishment and main-
tenance of free public schools in a school district is not so likely
to arise as in the larger and more diversified field of municipal
activity; and, therefore, the same rigid rule as to doubleness
in a proposition by a city to issue municipal bonds is not to
be applied to a proposition to issue school bonds, since the
same tendency to doubleness is not to be found in a proposi-
tion to issue bonds for a school district devoted by law to a
single broad purpose.

5. ———: ———: **Raised After Registration.** In determining
that it is the duty of the State Auditor to register certain bonds
presented to him, and to certify that all conditions of the law
have been complied with, the court does not decide that all
defenses of doubleness in a like proposition by which the
voters authorized the issuance of bonds are forestalled after the
bonds have been issued and put in circulation. That question
will be determined when it arises in a case turning thereon.

6. ———: ———: **School Bonds: Liberal Construction.** The
power of a school district to issue bonds must exist in the
statute and the school district must be kept within the limits
of said power; but the acts and record transactions of school
boards and electors are not to be critically analyzed, but are

to be liberally construed in aid of the purpose sought to be attained, namely, to provide increased and better school facilities.

7. ———: ———: ———: **Sites, Furniture, Repairs and New Buildings.** The statute does not treat separate schoolhouses in the same district, separate sites in the same district, and the furnishing of old and new schoolhouses as separate propositions, but treats them as one subject, the unity of which is indicated in the ultimate end to be reached, namely, increased and better school facilities. So that a proposition to increase a school district indebtedness by issuing $50,000 in bonds for the purpose of purchasing a site for a new school building and erecting a building thereon, to provide furniture and a heating plant for such new building, to provide heating plants for old school buildings, and to purchase a site, erect a new building thereon and furnish the same for the negroes—the proposed division of the proceeds of the loan to be: $10,000 to purchasing a site, erecting a building and furnishing the same for the negroes; $15,000 to purchasing a site for a new school building, and providing furniture and heating plants for the old school buildings; and $25,000 to erecting a new school building on said last-mentioned site—was not a double proposition, and the State Auditor cannot refuse to register the bonds on the theory that it was, though each voter was required to vote for or against the proposition as a whole by a single ballot. The elemental parts of the proposition are not incongruous, detached, or independent, and therefore the proposition is not double.

8. ———: ———: ———: **House for Negroes.** Nor is such proposition double because it apportions a certain part of the proceeds of the bonds to the building and furnishing of a school house for negro children. Nor is a separate vote for bonds to build a schoolhouse for them made necessary by the constitutional provision and the statute declaring that "separate free schools shall be established for the education of children of African descent." The race classification contemplated by that provision has other ends in view than taxation and bond issues.

9. **SCHOOL BONDS: Narrations Therein.** It is not necessary that bonds deal in a wealth of detailed recitals in enumerating the purposes of their issue. If school bonds recite that they were "issued for the purpose of purchasing sites, erecting school buildings and furnishing the same," and refer to the statutes under which they are issued, to the election authorizing them and to the orders passed by the board in pursuance thereof, and otherwise use the words of the statute, they contain sufficient recitals, although the purpose of issuing them was to purchase

a site for a school for whites and erect a building thereon, to purchase a site for a school for negro children and erect a building thereon, and to provide heating plants and furniture for such buildings and existing buildings.

10. ———: **Furnishing Existing Schoolhouses.** The words of the statute authorizing a school district to issue bonds "for the purpose of erecting schoolhouses and furnishing the same" are sufficiently comprehensive to authorize a proposition to issue bonds for the purpose of putting heating plants in existing buildings. The word "furnishing" is broad enough to include a heating plant, and "the same" cannot be confined to buildings erected out of the proceeds of the bonds, but includes all buildings.

Mandamus.

WRIT ABSOLUTE.

*Lozier, Morris & Atwood* for relator.

(1) The case of State ex rel. Memphis v. Gordon, 223 Mo. 1, is decisive of the question that the above proposition is not a double, but is a single one. The Attorney-General and his assistants recognize this and for that reason and that alone, ask this court to reverse itself and overrule that decision. While we do not agree with the views of the Attorney-General and his assistants to the effect that the Memphis case abrogates the rule against doubleness in propositions where the facts of each particular case justify its proper application, their brief shows that they believed and knew that under that decision the proposition involved in the case at bar was single and not double, and that under the authority of that decision the bonds in question should have been registered by respondent when presented to him for that purpose, without the necessity of this suit. We insist that neither the respondent nor the Attorney-General has any right to disregard the decisions of this court because they do not approve of the reasoning or the conclusions reached. We most respectfully insist that they have no right in this case to ask that the

Memphis case be overruled. The respondent is but an administrative officer of the State and has no right to decline to discharge the duties of his office as defined by the decisions of this court, even though he may think that such decisions are bad law and ill reasoned. Neither has the Attorney-General the right to advise respondent to refuse to register the bonds which are entitled to registration under the authority of the Memphis case because he may think that case bad law and ill reasoned in its premises. Dalton v. Poplar Bluff, 173 Mo. 44. (2) In the case at bar, we are not concerned with municipal profligacy, or with the issue of municipal bonds. We are concerned with the issue of school district bonds issued by virtue of the school laws of the State, and it has been the policy of this court, in construing such laws, to adopt a liberal policy in view of the great public purpose which they accomplish. We do not dispute that an act of the Legislature carries with it the presumption of its validity; neither do we deny that an issue of school district bonds must be supported by proof and not by a mere presumption of their validity, but when this proof is furnished, as in the case at bar, such bonds are just as valid in their sphere as an act of the Legislature is in its sphere, and the one should be as liberally dealt with by the courts as the other. Thornburg v. School District, 175 Mo. 23. A proposition adopted by the voters of the school district is the people legislating for themselves. Surely the people, in what they have a right to do for themselves, will not be dealt with less liberally by the courts than the agents who do not act for themselves, but for the people. A school district is not a municipal corporation, and therefore could not be guilty of municipal profligacy. The decision in the Memphis case gave sections 9752 and 9752a a fair, reasonable and common sense construction, taking into consideration the subject (the public school system) that was dealt with, and the beneficial public purposes such statutes were de-

signed to accomplish. The Attorney-General attempts to show that under the reasoning in the Memphis case, municipal corporations like Joplin and Bethany could submit a proposition to vote bonds for all the purposes for which such municipalities are authorized by statute to vote bonds, such as water works, electric light plants, sewers, city halls, etc., all at the same time, and as one proposition upon which but one expression of the voters would be taken, and that such a proposition would not be double under the Memphis case. But such is neither the reasoning nor the effect of that case. That case construed sections 9752 and 9752a upon a phase not heretofore decided by this court, and in doing so the court, reasoning from similars to similars, called to its aid the reasoning applied in former decisions of this court in construing section 28, article 4 of the Constitution. That section of the Constitution was designed to remedy the same character of evils as results from submitting two unrelated and incongruous propositions as one to the voters. But under our school laws, schoolhouse sites, school buildings and furnishings, are related matters and all three are necessary and integral parts of a completed whole. To have schools in a distract, it is indispensable to have adequate physical equipment and facilities. It would be useless to have furnishings and no building to put them in, or to have a site and no building thereon, or to have a building and no furnishings. It is an absolute necessity to have a site, building and furnishings in any district. These three things are necessary and integral parts of a completed whole. It cannot be said that sites, buildings and furnishings are independent, unrelated and incongruous matters. (4) School districts are not municipal corporations. They are entirely different from them in scope and purpose. School districts are organized for the sole purpose of education. They have no double purpose. 25 Am. and Eng. Ency. Law (2 Ed.), p. 31; 35 Cyc. 813; 1 Dillon on Mun. Corps., sec.

22; Heller v. Stremmel, 52 Mo. 311; State ex inf. v. Henderson, 145 Mo. 339; State ex rel. v. School Board, 112 Mo. 218; State ex rel. v. Leffingwell, 54 Mo. 475. The school district not being a municipal corporation, the rules of law governing such corporations are not applicable to or controlling upon such districts. The laws regulating municipal corporations should not and do not govern the subdivisions of the State, organized solely for carrying out the educational policy of the State. Lehew v. Brummell, 103 Mo. 550; Roach v. School Board, 77 Mo. 487; State ex rel. v. Tracy, 94 Mo. 221. All the Missouri cases cited in support of the doubleness of the proposition involve municipal corporations. None of them have to do with school districts or the interpretation or construction of the school laws of this State. (5)   The separate schools established for the education of children of African descent are a part of the public school system, and aid in accomplishing the same purpose. State ex rel. v. Jones, 155 Mo. 576.

*Elliott W. Major,* Attorney-General, *Chas. G. Revelle* and *James T. Blair,* Assistant Attorneys-General, for respondent.

(1)   The three legally separate propositions were: 1st, to purchase a site for, erect and furnish a new school building; 2nd, to purchase heating plants for the old school buildings; 3rd, to purchase a site, erect and furnish a new building for the negroes. Under our law these propositions should have been separately submitted. Since they were not so submitted, but submitted *in solido,* the Auditor's refusal to register the bonds issued pursuant to such submission was right. (2) Objection that the proposition was double must be raised before the bonds are negotiated. Such objection could not be urged after the bonds had been delivered to the purchasers and their proceeds received by the board. The doctrine of estoppel operates to quiet the

purchaser's title, so far as the objection for doubleness in the proposition submitted. is concerned, in case the bonds are delivered and the proceeds accepted before such objection is made. Van Hortrup v. Madison City, 68 U. S. 297; Sala v. New Orleans, 21 Fed. Cas. 22; Mercy v. Ohio, 17 Fed. Cas. 65; Huidekoper v. Buchanan County, 12 Fed. Cas. 838; Clarke v. Supervisors, 27 Ill. 310. (3) The rule against the submission of double propositions is one of natural right. Unless each proposition which is distinct is submitted without any other combined with it, it is not, in law, submitted at all. McMillan v. County Judges, 3 Ia. 320; Gray v. Mount, 45 Ia. 595; State ex rel. v. Allen, 186 Mo. 674; State ex rel. v. Wilder, 217 Mo. 270; Supervisors v. Railroad, 21 Ill. 374; Constitution of Mo., art. 2, sec. 9; Lewis v. Comrs., 12 Kan. 213. (4) The scope of the rule against submissions uniting different propositions. State ex rel. v. Allen, 178 Mo. 575; State ex rel. v. Allen, 186 Mo. 674; R. S. 1899, sec. 5968; State ex rel. v. Wilder, 200 Mo. 101; State ex rel. v. Allen, 186 Mo. 673; State ex rel. v. Allen, 183 Mo. 291. These cases clearly deny the right of a city to submit as one question propositions to buy or construct an electric light plant and buy or construct a separate waterworks plant. Yet the statute under which the bonds were attempted to be authorized dealt with electric light plants, waterworks and numerous other things. If a submission can combine propositions for issuing bonds to provide money for all municipal purposes, there can be no rule against doubleness in submission in this State. McMillan v. County Judges, 3 Ia. 320; Gray v. Mount, 45 Ia. 591; Supervisors v. Railroad, 21 Ill. 374; Farmers' L. & T. Co. v. Sioux Falls, 131 Fed. 912; Water Co. v. City, 57 Oh. St. 374; Lewis v. Comrs., 12 Kan. 213; Railroad v. Peterborough, 49 N. H. 294; Brown v. Carl, 111 Ia. 611; Jameson, Const. Conv., Appendix F., pp. 671, 672; State ex rel. v. Powell, 77 Miss. 572; Denver v. Hayes, 28 Colo. 114;

Cain v. Smith, 117 Ga. 904; Leavenworth v. Wilson, 69 Kan. 78; Hempstead v. Seymour, 34 Misc. 95; People ex rel. v. County, 22 Ill. 156; Clark v. Board, 27 Ill. 310; Railroad v. County Clerk, 74 Ill. 32; Garringus v. Board, 39 Ind. 73; Bronenburg v. Board, 41 Ind. 504; Finney v. Lamb, 54 Ind. 2. (5) The Memphis case should be overruled. The case of State ex rel. Memphis v. Gordon, 223 Mo. 1, while distinguishable from the case at bar in some respects, nevertheless so limits the rule against doubleness in submissions as to entirely destroy it if the decision in that case is to be followed in any case involving such a question. We respectfully ask the court to re-examine that decision, to the end that this court may make it plain either that there still does or does not exist in this State a rule that two separate propositions cannot be united in one submission to popular vote. In the Memphis case this court came to the conclusion that the same rules and reasons, and only those, used in interpreting section 28 of article 4 of the Constitution, were the basis of the rule against doubleness and must be employed in determining whether a submission contained more than one proposition. This conclusion, we think, should be carefully examined before it becomes a permanent part of our jurisprudence. 1. The rule of the courts is and has always been to give the Constitutional provisions mentioned "a very liberal interpretation," and "the courts have endeavored to construe it so as not to limit or cripple legislative enactments any further than what was necessary by the absolute requirements of law." So quoted this court in the Memphis case (l. c. 14) from the case of State v. Miller, 45 Mo. 497. The reason for that rule is, in part, the hesitancy with which courts interfere with the fruits of the labors of a co-ordinate department of the State government. The point is, however, that liberality of construction is the guiding principle in construing the title of legislative acts. The Legislature is invested with full power to legislate ex-

cept in so far as its power in that respect is expressly limited by the Constitution. Ex parte Roberts, 166 Mo. 212; State v. Swagerty, 203 Mo. 527. Such is the atmosphere this court must breathe while engaged in the construction of sec. 28, art. 4 of the Constitution. On the other hand, contrasted with that condition, stand the carefully drawn restrictions placed by the Constitution itself upon the power of municipalities to vote bonds, taxes, subscriptions, etc. Constitution of Mo., art. 9, sec. 6; art. 10, sec. 12; art. 11, sec. 11. The act of the Legislature carries always with it to the bar of this court a presumption of its validity. Bonds issued under the limited powers granted to school districts in this State, on the contrary, are supported by no presumption, but proof of their validity is always necessary. Thornburg v. School District, 175 Mo. 23. These observations and authorities disclose the difference between the legislative act and the submission to a vote on bonds. The one is enacted by the body which is the general agent of the people, the general repository of all legislative power not expressly denied it. The other is the exercise of a power but grudgingly yielded to a municipality, to be exercised to a limited extent, in a prescribed way, and for limited purposes. State ex rel. v. Owsley, 122 Mo. 75. There is a clear intent in our Constitution to make impossible municipal profligacy. Under such circumstances to say that a rule of liberal construction is to be applied to the exercise of such carefully restricted powers is to oppose this court to the clearly indicated policy of the Constitution. Cain v. Smith, 117 Ga. 904. 2. Under the rule laid down in the Memphis case no case heretofore decided by this court on a similar question, in which the bonds were refused registration, can be upheld. If the rule is the same as to the doubleness of a proposition submitted to the voters as the rule in regard to the singleness of the subject which can be dealt with under the title to a legislative act (as said in the Memphis case),

how can the Joplin sewer proposition be held double if the title to the act is held good? If the rule laid down in the Memphis case is to be maintained, the city council of Joplin could lawfully submit a proposition embracing bonds for sewers and parts of sewers, waterworks, wells, market houses, hospitals, prisons, workhouses—in fact, all public improvements authorized in cities of the third class by article 4 of chapter 91, R. S. 1899, for the right of the Legislature to include all matters relative to cities of the third class under one title is not open to debate. If this is answered in the affirmative, we respectfully inquire what is the force and effect of the decisions of this court in the cases of State ex rel. v. Allen, 186 Mo. 673; State ex rel. Joplin v. Wilder, 217 Mo. 267, and State ex rel. Chillicothe v. Wilder, 200 Mo. 97. Here the question submitted proposed two separate buildings on separate sites, with their furnishings, and then proposed heating plants in still different buildings. If this submission did not include more than one proposition, none can be conceived which does. The court intimated in the opinion in the Memphis case that "the general improvement of school facilities" could be voted in a single submission. Why, then, cannot "the general improvement of" city facilities and conveniences be included in a like submission? Most respectfully we submit that either the Memphis case should be overruled or all other decisions in this State ought to be expressly declared to be no longer the law. The law should not be one thing for school districts and another for cities and towns. That sort of confusion is easily avoidable by overruling either the Memphis case or, then, all its predecessors. (6) The bonds are not in proper form. The bonds offered for registration contain this recital: "This bond is one of a series of like tenor and effect, numbered from one to one hundred, inclusive, issued for the purpose of purchasing sites, erecting school buildings and furnishing same." There is no mention of an intent to use

any of the proceeds of the bonds presented for the purpose of providing heating plants for the old buildings—an important feature of the question submitted. It is only the new buildings for which sites and furniture are to be purchased. The bonds do not conform to the board's resolution calling the election, to the notices or either of them, nor to the combination of propositions submitted. That they must do so if they are to be held valid and subject to registration by the State Auditor seems self-evident. The question has been expressly so decided. Potter v. Lainhart, 44 Fla. 660.

*Busby Brothers & Withers amici curiae.*

Said bonds are invalid because one of the propositions contained in the submission to the voters is not authorized by law. One of the propositions submitted and voted upon jointly with other propositions, by the voters of the Carrollton school district, and for which it is proposed to bond said district, is: To provide heating plants for the old school buildings. The voting upon this proposition jointly with others, not only made the election void on account of doubleness of propositions submitted, but also because it was not authorized by law. Section 9752, R. S. 1899, under which said election was attempted to be held, provides, so far as is material to the matter in hand, that "For the purpose of erecting schoolhouses and furnishing the same in cities, towns and school districts, the board of directors shall be authorized to borrow money, and issue bonds for the payment thereof, in the manner herein provided," etc. It nowhere appears in the section just quoted, nor do we think in any other, that school districts can be bonded for the purpose of putting heating plants in old school buildings. True, the district may be bonded for the purpose of erecting schoolhouses and furnishing the same; and it may be said "that furnishing the same" includes heating plants. But heating plants for what? For the new building for which the

district. is supposed to be bonded, and not for any old building or buildings the district may already have. Legality cannot be voted into a bond issue for a purpose not recognized by law, even though the illegal purpose be joined with a legal one. · Money to provide heating plants for old school buildings must be raised in some manner other than by issuing bonds therefor. Richardson v. McReynolds, 114 Mo. 650'; State ex rel. Chillicothe v. Wilder, 200 Mo. 104.

LAMM, J.—The State Auditor refuses to register and·*vise* certain school bonds of the Carrollton School District. Relator sues by mandamus to compel him to do so.

Waiving an alternative writ, the State Auditor, through our learned Attorney-General, enters his voluntary appearance, and, carrying all his eggs in one basket, rests the case on a demurrer to the petition. In strict practice, issues of fact or law are framed on the narrations of the alternative writ in mandamus and a return raising questions of law or fact. But since the alternative writ follows the petition, the waiving of such writ is (*ex gratia*) equivalent to treating the petition as and for an alternative writ, and, in such event, to raise an issue at law on the petition itself is not without precedent. [State ex rel. v. McIntosh, 205 Mo. l. c. 593.]

The petition covers twenty-nine pages of print and, though the demurrer is general as well as special, the points and range of argumentation in the briefs so restrict the case made as not to call· for the reproduction here of all its verbiage. Summarized, it appears therefrom that relator by its board of directors on April 9, 1909, made an order submitting to the qualified voters of the district a proposition to create a district indebtedness by issuing $50,000 in bonds for the purpose of purchasing a site for a new school building, erecting a building thereon, providing furniture and a

·heating plant for such new building, providing heating plants for old school buildings and purchasing a site, erecting a new school building thereon and furnishing the same for the negroes—the proposed division of the proceeds of the loan to be as follows: $10,000 to purchase a site, erect a building and furnish the same for the negroes; $15,000 to purchasing a site for a new school building and to provide furniture and heating plant for such new building, and heating plants for the old school building; and $25,000 to erecting a new school building on said last-mentioned site. The bonds were to be of the denomination of $500, 5-20's, interest payable semi-annually at four per cent, evidenced by coupons. The order provided for a notice of a special election, treated the proposition as one subject and required those voting for it—that is, for the loan of $50,000—should have written or printed on their ballots, "For the loan," those voting *contra* "Against the loan." The secretary was directed to make publication of the notice in two named newspapers and to post notices at five public places in the district for fifteen days prior to the election calling a special election of qualified voters for April 27, 1909. At a subsequent meeting the board chose judges and clerks, and it appears the notices required by the first order were duly posted and published in obedience to the order, said notices showing its terms and also treating the proposition as single. The school records further show that in due time afterwards, to-wit, on May 4, 1909, the returns of the election were presented to the board as certified by the judges and clerks, showing 687 votes cast, of which 467 voted "For the loan" and 216 "Against the loan." Thereupon the board canvassed the returns and declaring the proposition carried by more than a two-thirds' vote, ordered the bonds issued to bear date August 1, 1909, to conform to the provisions of the notice and a tax was ordered levied and certified to pay the interest and create a

sinking fund. Subsequently an advertisement was ordered asking for bids. Bids coming in for 97½ cents of the par value, they were rejected as unsatisfactory. Subsequently, in September, 1909, a new advertisement was ordered for bids. Subsequently it appears from the records that advertisement was made and bids received—among them, one from the W. R. Compton Bond & Mortgage Co., of St. Louis, offering $47,535 and accrued interest, and agreeing to print the bonds. This bid was accepted and the bonds ordered issued when that company was satisfied of their legality. Subsequently on February 12, 1910, the board met to work out the details of the bond issue. It then passed a resolution narrating the original order for the special election, the vote on the proposition, the issue of $50,000 in bonds to provide funds to purchase sites, erect school buildings, etc.; that due notice of the election was given by posting five notices in five public places in the district for more than fifteen days prior to the election; that the election was held on the date called, the result duly canvassed, etc., and declared to be in favor of the loan and for the issuance of the bonds; that, including said bonds, the existing indebtedness of the district does not exceed five per cent of the valuation of the taxable property, based on the assessment next before the last assessment for State and county purposes; and that the board of directors had full authority to issue the bonds under chapter 154, Revised Statutes 1899, as amended. Based on premises so narrated, it was ordered that 100 bonds be issued, numbered from 1 to 100 inclusive, dated August 1, 1909, due August 1, 1929, payable at the option of the district at any interest-bearing period on or after August 1, 1914, bearing four per cent interest, payable semi-annually, to be signed by the president and secretary of the board, etc. The form of the bonds and coupons was then set forth in substantial accordance with the terms theretofore prescribed by the order. Each bond, *inter alia,* had a

narration to the effect that it was one of the series of like tenor ''issued for the purpose of purchasing sites, erecting school buildings and furnishing the same'' under authority of chapter 154, Revised Statutes 1899, as amended, ''and of an election duly called and held on the 27th day of April, 1909,'' at which more than two-thirds of the votes cast were for the loan and in favor of issuing the bonds ''and by further authority of orders duly passed by the board of directors of said school district.'' It then recited that acts, conditions and things required by the statutes to be precedent to the bond issue had happened, been done and performed in regular order and due form; that a tax had been levied and ordered certified to pay the principal and interest; and that the district indebtedness, including the bonds, did not exceed the constitutional and statutory limit. It is further alleged that at that time and place, for the purpose of providing for the payment of the interest and creating a sinking fund, it was ordered that there shall be and ''there is hereby levied an annual tax'' on all the taxable property within the district sufficient to pay the sum of $4500 per year, or so much as may be necessary in each year, from 1909 to 1928 inclusive—that sum being $2000 yearly for interest and $2500 yearly for sinking fund; that said taxes should be extended as other school taxes for each year, and the levy should be annually certified to the county clerk, etc. A provision was then made for paying the interest to be due February 1st, and August 1, 1910.

The petition further alleges, in substance, that the district had 5000 inhabitants, required more than one public school building and contained more than fifteen colored children of school age, as shown by the last enumeration before voting the bonds; that the amount of the bonds does not exceed (including the present indebtedness of the district) in the aggregate five per cent of the taxable property therein, as shown in the assessment next before the last for State and county

purposes previous to incurring the indebtedness for said bonds; that said bonds were thereafter issued in pursuance of the authority of the statutes, and were presented for registration to the State Auditor with the proper fee and the proper proof showing legal requirements complied with, but the Auditor refused registration, leaving relator no remedy except by mandamus.

The grounds of demurrer are:

"First: Said petition fails to state facts sufficient to constitute a cause of action.

"Second: Because the petition upon its face discloses that more than one separate and distinct proposition was embraced in the question submitted to the voters and voted on by them at the election mentioned in the petition.

"Third: Because the petition upon its face discloses that the question submitted was not single, but embraced three separate and distinct propositions.

"Fourth: Said petition and the matters and things therein as stated and set forth are not sufficient in law nor in equity to entitle the relator to the relief prayed for in the petition nor to authorize the issuance of the writ of mandamus prayed for therein.

"Fifth: Because the notices of the election, by virtue of which the bonds involved were issued, were insufficient.

"Sixth: Because the bonds issued do not conform to the propositions voted on, nor to that submitted, nor to that set out in the notices of election.

"Seventh: Because said bonds were negotiated and sold before the same were offered for registration and before the same were registered as required by law."

I. It will be observed the first ground struck at the sufficiency of the petition in stating a cause of action. In a broad sense, some of the specific grounds following are logically included in the first and might be con-

sidered under that head. We do not see that counsel discuss their general challenge, save inferentially and in so far forth as they seek to justify their special grounds. In this view, what we have to say may as well be said in determining the special grounds. Accordingly, we take that course.

II. The fourth ground is but an amplification of the first and needs no independent consideration. Like the first, it will be determined when the special grounds are set at rest.

III. The fifth strikes at the sufficiency of the notices for the special election. Other than the fact that the election notices set forth one general proposition to be voted up or down, viz., the question of loan or no loan, we do not see that counsel follow up the fifth by any suggestions calling for judicial consideration.

IV. The seventh is rested on the theory the bonds were "negotiated and sold" before they were offered to the State Auditor for registration by him as required by statute. This contention travels on a misapprehension of the petition. True it is, the sale of the bonds was negotiated in one sense in which that word is usable. An allowable use of that word expresses the idea of intercourse, or treating with—holding intercourse with view to coming to terms upon some matter, as a purchase, sale or treaty; and, speaking loosely, they were sold before presentation for registration. But it is not alleged that the sale was perfected by delivery or payment; nor was it intended to be so completed prior to registration. Delivery is of the essence of a completed sale, and payment in the case at bar was to be coincident with delivery. If the theory of counsel be that a school district is put to the trouble, expense (and possible detriment) of registering its bonds with the State Auditor and for all time making an abortive public record calling for explanation and affecting its credit, whether it can find a purchaser for them or not

and before it even tries to find one or has the promise of one, then we do not agree with counsel. Mere preliminary negotiations, looking to finding an ultimate purchaser, fall neither within the mischief to be retarded or the benefits to be advanced by the statute (R. S. 1909, sec. 1275) reading: "Before any bond . . . shall *obtain validity* or be *negotiated,* such bond shall first be presented to the State Auditor," etc. As used in the statute the phrase, "obtain validity," means to become clothed with validity as a present, subsisting and legal outstanding obligation. "Negotiated" in the sense used in the statute means sold out-and-out; that is, issued and put in circulation, delivered in consummation of a sale. To negotiate, in the usual technical and legal sense used by law-writers in speaking of commercial paper, means "to transfer for a valuable consideration under rules of commercial law; to sell; pass." [Webster's New Interna'l Dict., tit. "Negotiate."] In laws and law books the word "negotiate" is sometimes used in both senses mentioned, viz., as meaning to discuss or arrange for a sale or bargain, or the preliminaries of a business transaction—also, "To sell or discount negotiable paper, or assign or transfer it by indosement or delivery." [Black's L. Dict., tit. "Negotiate."] Obviously the statute uses the word in the latter (while counsel in their demurrer use it in the former) sense. The object of the statute requiring the registration of bonds prior to their negotiation is fully subserved by making registration of bonds a condition precedent to actually floating the bonds on the market, putting them in circulation by sale. The State interests itself by interference before the point of actual negotiation and sale, by granting or withholding a passport for them, and not before the point of preliminary discussions or arrangements heading toward a sale. Therefore, since the petition shows these bonds were not (and were not intended to be) delivered and paid for prior to registration, they were not *sold* or *nego-*

*tiated* within the purview of the statute. Accordingly, the point is ruled against respondent.

V.    There are left the second, third and sixth grounds of demurrer. The second and third, in just intent and purpose, are one and the same. A determination of one determines the other. The case then narrows itself to these blunt questions:

Was the proposition submitted to the voters of the Carrollton school district obnoxious to those principles of law interdicting doubleness in the subject submitted to a vote? In other words, did the proposition embrace several single and distinct propositions or subjects, each calling for submission separately?

Do the bonds tendered for registration substantially conform to the proposition set out in the notices and voted on? In other words, is there such a variance between the narrations covering the purposes of the loan as set forth in the bonds and as set forth in the orders and notices submitting the proposition to the voters as justified the Auditor in refusing to *vise* and register them?

On the theory the proposed division and use of the proceeds of the loan, in and of itself, determines the doubleness or singleness of the proposition submitted, it is contended by our learned Attorney-General and his learned assistants that the proposition in the instant case was vicious for that it covered three legally separate and distinct objects, which by analysis are said to be: (1) To purchase a site for, erect and furnish a new school building; (2) to purchase a heating plant for the old school buildings; and (3) to purchase a site, erect and furnish a new building for the negroes. They argue those several propositions should have been separately submitted, hence, failing in that and being submitted *in solido,* the Auditor's refusal to register was well enough.

In the evolution of their argument, in order to relieve the gravity of the situation and to set at rest

any just fear of danger to outstanding school bonds from the rigid appliance of the rather strict doctrines they invoke, they maintain that the objection that the proposition was double, in order to be effective at all, must be raised before the bonds are negotiated—and if raised afterwards it is of no avail as a defense to their collection. They argue that the rule against doubleness is one of natural right; that it is not related in reason or principle to the constitutional rule relating to one subject to be clearly expressed in the title of a statutory bill; therefore, they say, the liberal construction of that constitutional provision universally adopted by courts is out of place in cases of the character of the one at bar. Moreover, they deliver a pointed and set attack on a late case (confessedly opposed to some contentions made by them), viz., State ex rel. Memphis School District v. Gordon, 223 Mo. 1. The Memphis case, they argue, strikes a lone and discordant note in our decisions. Doubting the soundness of its reasoning, it is argued that its grounds should be re-examined and it should not "become a permanent part of our jurisprudence" until deliberately affirmed on reconsideration; for they fear it unsettles the law, opens wide the door for mischief to enter, and should either be exploded or else a line of prior cases should be overruled. Finally they argue that the bonds were not in proper form in that all the purposes for which they were issued were not fully bodied forth in their narrations. The point to this contention rests on the language of the bonds, viz., that they were issued "for the purpose of purchasing sites, erecting school buildings and furnishing the same" instead of detailing specifically each and every purpose outlined in the election order, notices, submission and ballots.

On these contentions we make the following observations:

(a) Learned counsel for relator, on the premise that the Carrollton bonds were held in abeyance await-

ing the determination of the Memphis case, insist that
case was not only well ruled but that our Attorney-
General had no call to advise the State Auditor to re-
fuse registration merely because he deemed that case
an unsound exposition of the law, nor had the State
Auditor the right to refuse registration on his own
initiative on the theory the Memphis case ought not to
be followed. They argue the Attorney-General and
Auditor should have dutifully (however ruefully)
bowed to the ruling in the Memphis case—this, be-
cause they had no right to follow official views contrary
to the judgment of this court, thereby with one stroke,
usurping judicial functions and putting an unusual and
unfair burden of delay and vexation upon relator. But
we shall not take that view of it. The Memphis case
was ruled by a divided court. Our Attorney-General,
charged under his official oath with high duties of state,
would have been remiss in performance if he had not in
a respectful way, as here, challenged so late a case, pro-
vided in so doing he puts aside his own pride of opinion,
and provided his learning and research in the law lead
him to believe the case unsoundly ruled. In jurispru-
dence (as to another case) it is a precept that no prop-
osition of law can be taken as finally decided until
rightly decided, and although that case was fully con-
sidered in the first instance and considered anew on a
motion for a rehearing (held over to take time to con-
sider) yet it is not immune from proper challenge by
the highest law officer of the State moving in the consti-
tutional and statutory orbit of his own duty. No
judicial pride of opinion may foreclose such challenge,
for this court has no personal ends to subserve. Its
ends are alone the ends of justice to be attained by a
patient, serene, and just interpretation and administra-
tion of the law—to do right as it is given to the court
to see the right. On the one hand we ought not to be for-
ever settling and unsettling, planting and pulling up,
buttoning and unbottoning, knitting and unraveling; on

the other, an opinion that cannot stand re-examination should not stand at all. So, a court unwilling to re-examine is unworthy to sit in judgment. As I wrote the Memphis case, I must perforce be glad of an early and effectual chance to be relieved from the evil repute of writing bad law and (possibly blind myself) leading my esteemed brethren (likewise blind) into the ditch of error, if such be the fact. So much by way of preliminary.

(b) I am commissioned by a majority of this court to say that we stand by the Memphis case. The proposition submitted to a vote in that case was to issue bonds and incur indebtedness in the amount of $22,500; for the purpose of using $20,000 to build a schoolhouse and furnish the same in the first school ward of Memphis and $2500 in building an addition and improving the schoolhouse in the second ward. That proposition was attacked as double by our Attorney-General and sustained by this court as single. In reaching that conclusion we levied tribute on the settled judicial exposition of the constitutional provision (Const., art. 4, sec. 28) providing that: "No bill . . . shall contain more than *one subject,* which shall be clearly expressed in its title." Reasoning from similars to similars, we concluded that the reasons underlying that constitutional interdiction were of kith and kin to the reasons supporting the proposition against doubleness in the matter of bond issues authorized by a vote of the qualified voters of a school district.

Now, a case may stand on its own reasoning. If soundly reasoned it needs no support from precedent. Witness the robust and brave *dictum* of so learned and conservative a judge as Lord Chief Justice WILMOT. at the Easter Term, 1767, in a case argued and adjudged in the Court of Common Pleas at Westminster (Collins v. Blantern, 2 Wils. l. c. 352): "I want no case to warrant my opinion," he said; "it is enough for me if there be no case against me, and I think there is

not.'' But the Memphis case in the foregoing partic-
ular was not without an entirely respectable precedent
and we there quoted an *apropos* announcement of the
law by Peters, C. J., in Hubbard v. Woodsum, 87 Me. l.
c. 95. [See State ex rel. v. Gordon, supra, l. c. 16, *et seq.*]
We there further said that ''the vote of the people on a
proposition stands in the nature of a legislative act.
A successful vote on a proposition is in the nature of
the adoption of a law. The proposition when adopted
becomes, in a sense, law—a local act; therefore, . . .
the method of its adoption is within the principle of
the constitutional provision controlling legislation.''
In that connection we cited McMillan v. Lee County,
3 Ia. 311, a case much in evidence in the brief of re-
spondent. It not only abundantly sustains the view
just announced, but it holds language so apposite on
the main point and so fortifies the views of Peters, C.
J., in the Hubbard case, quoted with approval in the
Memphis case, that at the expense of brevity we re-
produce some of it. That was a case in which three
separate propositions to subscribe stock in three several
railroads, $150,000 in each, was put severally to the
voters of Lee county by the county judge under author-
ity of then existing Iowa statutes to be voted up or
down. The notices given the electors contained, how-
ever, the following singular provision as a *condition*
to any stock subscription, viz.: ''That a majority of
the vote given for each proposition for subscription of
stock, should be considered as an adoption of the same,
but that the subscription should not be made to either
of the said companies unless there should be a majority
of the votes cast in favor of each and all of them.''
In holding that condition obnoxious, Stockton, J., fol-
lowing expression of views supporting the principle of
law interdicting doubleness, said:

''Our conviction of the correctness of these views
is strengthened by the consideration that the Constitu-
tion of the State provides in reference to acts of legis-

lation by the General Assembly, that 'every law shall embrace but one object, which shall be expressed in the title.' [Art. 3, sec. 26.] The purposes to be secured, as well as the evils to be remedied or avoided, by this provision, can hardly be the subject of controversy. It was intended to place a check upon a mode of legislation by which measures wholly incongruous, in many instances deleterious and objectionable, were passed into laws by uniting them together in one bill, and thus securing the support and influence of the separate friends of each, to pass them all into a law—a practice so long pursued that it had in some localities grown into a system, the evils of which have become barely less than historical. The constitutional restriction upon the legislation of the General Assembly does not in its letter apply to the qualified legislation provided for by the statute in the case of the borrowing and the expenditure of money, or levying taxes to pay the same, by the county judge. We can well apprehend, however, how it may become requisite that the spirit of this provision of the fundamental law should run through all the acts and measures of such inferior and subordinate authorities and tribunals as may have committed to them, in even a qualified sense, the duties and responsibilities of legislation. The authority vested in the county judge, of submitting certain questions to the vote of the people of his county, which when adopted by them are to have the force and effect of an act of the General Assembly, is derived entirely from the statute. . . . In the spirit of the prohibitory clause of the Constitution, to which reference has been before made, we must hold that he is to be confined in the submission of any question by him, to the vote of the people, to such as shall embrace only one object.''

It will thus be seen we did not ''transplant the ideas of the Supreme Court of Maine to Missouri''—ideas deemed, it seems, novel and anxious—though no reason is apparent why good doctrine may not spring from so

learned and distinguished a tribunal. But if geographical lines are to become a component part of the interpretation of general law, and of the promulgation of its general principles, then the Memphis case fulfills that rather anomalous requirement, for it is sustained by the appellate court of a neighboring State, a State once a part of the territory of Missouri.

Holding a statute unconstitutional is so grave a matter that a court must be satisfied beyond a reasonable doubt. A statute is presumed to be constitutional. We did not rule in the Memphis case that such presumptions attend the vote of the people on a bond issue precisely as they do an act of the General Assembly and do not so rule now. But we ruled then and rule now that the mischiefs struck at by the constitutional provision with reference to legislation are related to the mischiefs struck at by the rule against doubleness in propositions submitted to electors. We ruled there and we rule here that the spirit of the interdiction in both instances is the same; and that, in order not to apply so acute and hair-splitting an analysis as would unreasonably handicap legislation, the accepted doctrine has come to be that the constitutional provision should be liberally construed; that too much detail is as bad as too little; and that matters germane and incident to the subject do not constitute doubleness; while matters having no material and natural relation to each other are double in the sense of the constitutional interdiction. In the very nature of things no rule precisely defining doubleness can be laid down fitting each case. But it was not apparent to us in the Memphis case why, the mischief being the same, the spirit and principles of law being the same, the general conception of doubleness in the one instance might not do for a like conception in the other. We so ruled, in effect, in that case and we stand by that ruling now. No search by industrious counsel has found a case to the contrary, and we know of none.

The unity of object is to be looked for in the ultimate end to be attained, not in the mere details and incidents leading up to that end. We are cited to cases decided by us which counsel argue are out of line with the Memphis case. But as pointed out in the latter, the rule is that, since doubleness cannot be defined except in a general way, each case must stand on its own facts. We shall not prolong this opinion by discussing those cases. Many of them were reviewed in the Memphis case. As we read them, so far as they dealt with general principles, they are not out of line with the Memphis case. At bottom, they all hold that entirely independent, separate or incongruous matter may not be rolled up in a ball and thrown at voters.

Stress is put on what is known as the Joplin Sewer case, 217 Mo. 261. But in that case our Brother Burgess, *arguendo,* assigned as one reason for holding double the submission of a proposition for a "sanitary sewer" in one district and a "storm sewer" in another, that they had no *connection or relation* to each other; that the citizens in the one district were not interested in the sewer in the other, nor were the people of Joplin outside of the proposed districts served or benefited by either. [State ex rel. v. Wilder, 217 Mo. l. c. 270.]

Observe all the cases relied on by counsel relate to bonds of municipalities, and none of them to the bonds of a school district. It is argued that under the doctrine of the Memphis case there could be no such thing as doubleness in a proposition to vote school district bonds. Therefore, the case must necessarily be erroneously decided. This argument proceeds on a double misapprehension. In the first place, if the single purpose, the *raison d'etre,* of a school district and the laws regulating borrowing money to further such purpose, taken together, make it impossible to imagine or put a case of doubleness, then we might have call to admire, rather than to condemn, a system so plain and simple as to be in no danger from that source.

But, if put to it, we could readily state a supposable case of doubleness, or incongruity. The other misapprehension is that counsel treat a school district as precisely the same as a city or other municipality, and, since our cases show that this court has refused to compel the Auditor to register municipal bonds because of the vice of doubleness in propositions relating to them, it ought to be held that the same tendency to doubleness will be found to exist in school propositions. That view overlooks the fact that public municipal corporations have delegated to them an aggregation of diversified powers covering many of the activities of human life—so diversified and incongruous as to breed doubleness. They may, when warranted by law, build gas plants, manufacture and sell gas to consumers. Under like conditions they may build street car lines and engage in the carrying trade; under like conditions they may build electric light plants for city use and manufacture and sell electricity, light and power to consumers; they may buy and ornament parks, exercise the right of eminent domain and issue bonds for many purposes under cover of their delegation of power, when authorized so to do by a vote of the people. But a school district is but the arm and instrumentality of the State for one single and noble purpose, viz., to educate the children of the district—a purpose dignified by solemn recognition in our Constitution (sec. 1, art. 11), reading: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the General Assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state between the ages of six and twenty years." In obedience to that constitutional mandate, the General Assembly has established such schools and given over to school districts, acting through boards of directors, the single duty and authority to maintain them. As all roads in olden times led to Rome, so the whole minutiæ

of school affairs lead to that one end. Such district is in no sense a municipal corporation with its diversified powers, but is a quasi-public corporation devoted to a single broad purpose. [See authorities in relator's brief.] It may build school houses, furnish the same with heating appliances and other furniture, hire teachers, cause taxes to be levied to support public schools, and is granted power in specified instances to go above the dead constitutional level of tax rates when authorized by a vote. So, too, it may become indebted and issue bonds to borrow money to further the purpose of education and increase the facilities therefor, when certain emergencies arise and when authorized by a vote. When the district has done these things, it has filled its solitary statutory function. In a field so circumscribed, doubleness in propositions is not so likely to arise as in the larger and more diversified field of municipal activity. It is not singular, therefore, that the question had not been presented here for adjudication in school propositions prior to the Memphis case. Nor, when we consider that free schools are a tender point with a free people and that, as a rule, the best citizens gratuitously give their services to school boards, is it singular that but little scandal arises in the business administration of school districts.

Doubtless, as suggested in the Memphis case, there are outstanding a vast number of bonds voted on propositions like the one at bar. In that case a note of warning was sounded intended merely to bespeak and justify caution in dealing with so sensitive and far-reaching a matter as the credit and bonds of school districts. If we understand counsel, this note of warning had been taken as a *reason* or *ground* for the Memphis decision, and they make the point that when the bonds are once registered and certified by the State Auditor the mere fact that doubleness in the proposition exists cannot affect such securities in the markets or courts, i. e., after a registration and a *vise* they become couriers

without luggage. We are not called upon to decide whether bonds actually put in circulation are or are not immune from a defense arising from doubleness in the proposition voted on. That question can be taken care of when it arises in a case turning thereon. We did not intend to decide the Memphis case on such ground and nothing we say therein must be so construed. We recognize that courts are under a bounden duty to hew to the line in administering the law (first taking care to establish the right line), let the chips fall where they will. But that enough danger exists to warrant circumspection in dealing judicially with the foundation of school securities may be found in the very language of the statute requiring the State Auditor to not only register the bonds but to certify by his indorsement that all conditions of the law had been complied with in their issue; *vide,* section 1275, Revised Statutes 1909, in part reading as follows:

"But such certificate" ( i. e., the Auditor's certificate) "shall be prima facie evidence only of the facts therein stated, and shall not preclude or prohibit any person from showing or proving the contrary in any suit or proceeding to test or determine the validity of such bonds or the power of any county court, city or town council, or board of trustees, or school board, or other authority, to issue such bonds; and the remedy of injunction shall also lie at the instance of any taxpayer of the respective city, town, village, township or school district, to prevent the registration of any bonds alleged to be illegally issued or funded under any of the provisions of this article."

The Memphis case is criticised from another side. Counsel insist the power to issue bonds is one "grudgingly yielded to a municipality," and, therefore, the acts of school boards preliminary to issuing them (including the acts of electors in granting authority) are to be strictly construed, and no liberality is allowed in dealing with such acts. If by that is meant that the *power*

to issue the bonds must exist in the statute and the
school district must be kept within the channel of such
power, we agree to it; but if counsel mean that the acts
and record transactions of school boards and electors
are to be viewed with dainty particularity, with a cold
and critical eye and are not to be aided by liberal con-
struction, that such boards do not have a wise and large
range of discretion in the management of the business
affairs of the district, then we do not agree to it.

In speaking of acts leading up to the formation
of a new district, Fox, J., in State ex rel. v. Job, 205 Mo.
34, uses language in point, viz.: "It is but common
knowledge that matters pertaining to the interests of
the public schools in nearly all the districts of this State
rest with plain, honest, worthy citizens not specially
learned in the law, and if we are to look at all times for
a strict and technical compliance with the statute, then
we confess that numerous districts in this common-
wealth would fail of their purpose, for the reason their
organization did not meet such strict and technical re-
quirements."

Judge Cooley incorporates into his text (1 Cooley
on Taxation [3 Ed.], 5. 583) some observations of
Woodward, J., in Wharton v. School Directors, 42 Pa.
St. 358, not amiss, viz.: "The power of taxation, alto-
gether legislative, and in no degree judicial, is commit-
ted by the Legislature, in the matter of schools, to the
directors of school districts. If the directors refuse to
perform their duties, the court can compel them. If
they transcend their powers, the court can restrain
them. If they misjudge their power, the court can cor-
rect them. But if they exercise their unquestionable
powers unwisely, there is no judicial remedy." And
adds, "This is a clear and strong statement of a wise
and salutary general principle."

"When, therefore," continues that author, "a
school district, having competent power by statute to

do so, determines in due form of law to erect a school-house, no discontented party is to be heard to allege, as a basis for legal relief, that the building was unnecessary or the cost too great, or that in any other particular the action taken was unwise or impolitic.''

Speaking further to a phase of the matter in hand, that author says (pp. 573-4): ''In voting the tax the people will be acting in their political capacity, and their action is to be favorably construed, and not to be overruled or set aside by judicial or any other authority, so long as they keep within the limits of the power bestowed upon them. Technical defects and irregularities should be overlooked, so long as the substance of a good vote sufficiently appears, for the obvious reason that local business is largely and of necessity in the hands of plain people who are unskilled in the technicalities of law and unaccustomed to critical or even accurate use of language. A strict construction of their doings would inevitably be mischievous, and would defeat the collection of the revenue in very many cases. It will be found, therefore, that the courts sustain such action wherever sufficient intent appears to make plain the intent of the voters, provided the intent is warranted by the law.''

So far from running counter to the reasoning of a line of decisions of this court, we think the Memphis case accords with their spirit. In so far as learned counsel have fear of the result of the ruling in that case, we think it unfounded. The case but announces a rule which has heretofore been followed in voting and registering school bonds—a method never questioned before the Memphis case and which has resulted in avoiding complications, has . established the credit of our school districts on a solid rock, and has been attended with no noticeable corruption or scandal. The Memphis case should be read with this, for we will not reproduce and reannounce all the propositions ruled and the arguments advanced to support them. Construing sections

9865, 9778, 9752, Revised Statutes 1899, section 9752a, Laws of 1903, p. 266, with cognate sections of the school law, we there ruled, in effect, that the expediency of purchasing sites, building schoolhouses and furnishing the same was within the discretion of school boards. In those particulars the citizen acted through the directors and not *in propria persona.* If the money was on hand· to do those things the board could use the money in doing them without the citizen's interference; and, free from such interference, was authorized to cause taxes to be levied to support the schools up to a prescribed constitutional level; but when that limit was to be exceeded or bonds were to be voted (which are only another name for increased taxes), the people had a direct voice. That, in exercising their own discretion in determining the necessity for increased school facilities, the board of directors were authorized to put a rounded proposition to the voters to effectuate the whole purpose theretofore settled by the discretion of the board, as one plan to be consummated at one time. Accordingly, the voter does not vote directly on the expediency of building this or that schoolhouse, or furnishing the one or the other, or buying this or that site, but votes on a statutory subject matter designated as the *"question of loan,"* and his ballot can only be "For the loan" or "Against the loan" as a whole. [See R. S. 1899, sec. 9752.] That statute does not treat separate schoolhouses in the same district, separate sites in the same district, and the furnishing of such schoolhouses as double propositions, but treats them as one subject, the unity of which is indicated in the ultimate end to be reached, viz., increased or better school facilities. That as to such single statutory purpose, if intended to be split by a wedge of interpretation into elemental parts (elements being discoverable by nice analysis in any proposition), though none of those parts are incongruous, detached or independent propositions, such intent would have been evidenced by the statutes, because they were in-

tended as a plain and simple guide (not to the learned citizen, but) to the average everyday man. That the liberty of the voter was restricted to the plan of increasing the indebtedness of the district, when in the judgment of the board the plan as a *whole* was a proper matter to be submitted to a vote.

Holding, as we do, that the Memphis case should not be overruled, it necessarily results that those phases of alleged doubleness said to arise from voting bonds for buying two sites, building two schoolhouses and furnishing the same do not vitiate the bonds in the instant case, unless there be something obnoxious in mingling with the proposition submitted a school site and schoolhouse for children of African descent.

To that question we next address ourselves.

(c) The question is not elaborated by respondent's counsel. Though their brief on other questions is otherwise elaborately reasoned, they leave this practically unreasoned. It has been said that to leave a point needing support unreasoned, when counsel are well equipped to reason it, as here, is tantamount to abandonment or to an admission that it cannot be reasoned. [Thomas v. Scott, 221 Mo. l. c. 279; Hartzler v. Railroad, 218 Mo. l. c. 565.] They point us to section 3 of article 11 of the Constitution, reading: "Separate free public schools shall be established for the education of children of African descent." They point us to sections 9775 and 9774, Revised Statutes 1899, as carrying out that constitutional mandate and leave it with us, adding, by way of comment, that "those provisions emphasize the doubleness of a proposition which unites in the same submission a provision to borrow money to erect a schoolhouse for white children with one to borrow money to erect a new building for negroes."

Counsel for relator exhaustively review our Constitution and statutes on the general topic of educa-

tion and schools to further their argument that the
point is without vitality.

It appears from a preceding section of the Con-
stitution that the makers of that instrument considered
the education of *all* children a unit. Section 1, article
11, of the Constitution, supra, on the premises that a
general diffusion of knowledge and intelligence is es-
sential to the preservation of the rights and liberties
"of the people," ordains that "the General Assembly
shall establish and maintain free public schools for the
gratuitous instruction of *all* persons in this State be-
tween the ages of six and twenty years"—not white
children or black children, but *all*. Under that man-
date, the benefits from education are to descend like
the dews and rains of heaven on the heads of all alike.
That, for the benefit and integrity of both races, the
negro child should go to school in a separate school-
house in nowise touches the unity of the constitutional
purpose in education. A race classification of that sort
has other ends in view than taxation and bond issues.
Accordingly, the whole scheme of our statute con-
templates that schoolhouses and their appurtenant
furnishings devoted separately to the education of
whites or negroes should be the property of the same
district; that there should be but one district charged
with the duty of educating both races; that the estab-
lished and munificent school funds of the State should
be distributed *pro rata* with no eye to the color of the
child; that the same board of directors should admin-
ister school affairs for both whites and blacks; that the
dead level of taxation, permitted by the Constitution,
should result in a fund to be distributed *pro rata* with
no eye to color; that the same State Board of Educa-
tion should supervise the schools of both; that the same
county commissioner or superintendent should have
general direction of both in every county; that the
board of directors should be elected by the qualified
voters of both races voting on the same day and in

the same ballot boxes; and, if increased taxation requiring a vote becomes necessary, that vote should come from the qualified electors of both races and be delivered at the same time—the increased taxes to be used indifferently for white and negro schools. The same unity of purpose runs like a thread through statutes relating to bond issues to buy sites, build schoolhouses and furnish the same. Not one word of discrimination can be found in those statutes. If a mere classification directed to the maintenance of separate schools for children of African descent is to make double a proposition to build one schoolhouse for negroes and another for whites, then the universal classification of school children by age or intellectual advancement which results in maintaining a schoolhouse for primary scholars—in some instances, separate and distinct from high schools, or ward schools separate and distinct from a high school—would produce the same kind of doubleness in a proposition to build a high school in one spot and a ward school for grammar pupils in another spot, though both schoolhouses were intended for the children of only one race. In that view of it, the question has been disposed of in other paragraphs of this opinion. We leave it with the suggestion that as the body of our statute pertaining to school bond issues is not new, and since it is a well known fact that under the present statutory scheme bonds have been floated to build schoolhouses in many Missouri cities for both races, uniformly treating the proposition at the special election as one subject-matter, such administrative policy established by those charged with practically administering the law ought not to be disturbed by courts, except where such disturbance is imperiously demanded by the force of clear law. Such administrative policy does not preclude the question when sprung in court, but it is not without weight. *Consuetudo est optimus interpres legum.*

The point is ruled against respondent.

(d)   There is a subsidiary proposition briefly discussed by our Attorney-General, directed to the narrations of the bonds. As we grasp it, it is that the narration of "purpose" is not full enough. That it should have been to the effect that the purpose of issuing the bonds was to purchase a site for a white school, another for a negro school, erect a schoolhouse on the first and a schoolhouse on the second; furnish both and purchase heating plants for old buildings, instead of simply narrating that the bonds were "issued for the purpose of purchasing sites, erecting school buildings and furnishing the same," as they do. This form of expression is in the order of the board dealing with the details of the bond issue, of date February 12, 1910. Being intended as negotiable securities, we should expect to find in the statute provisions for such narrations as accord with the usages of commercial law, importing negotiability, such as date, certainty of amount, that they were payable in money, when payable, whether to order or bearer, the rate of interest, that they were for value received, etc. Accordingly, while the statute lays down no form for such bonds, it does provide what they should show in the foregoing particulars. [R. S. 1899, secs. 9752-9754; and see a new section—Laws 1901, p. 52, now sec. 1249, R. S. 1909.] In such bonds it is usual to find narrations (not prescribed by the statute, but) which aptly refer to the laws, ordinances, orders, elections, etc., authorizing their issue. So, it is usual and proper to concisely refer to the purpose for which the bonds are issued to earmark the bonds as within the warrant of authority. Such narrations act in the nature of a passport to negotiability and invite commercial confidence. But if we were to hold, absent a statute requiring it, that such narrations are necessary, yet we should not hold that the bond must deal in a wealth of detail in enumerating the purposes of its issue. The instant bonds refer to the statutes under which they were issued, to

the election authorizing them and to the orders passed
by the board of directors in that behalf, they use the
language of the statute, and we think the contention
that the narration is too concise is rather more tech-
nical than of substance. It should not be overlooked
that the bond purchaser is not interested in the use
of the proceeds so long as the proposed use indicated
by the bond, as here, is not illegal. That question is
somewhat *res inter alios acta,* as to him. The actual
distribution and use of the proceeds is more particu-
larly a question between the school board and the
citizens having the bonds to pay; and while we do not
decide the point, yet it may not be amiss to say that a
misuse of the proceeds by the board of directors by
diverting them to any purpose contrary to the submis-
sion or in disobedience to the vote by which the rounded
proposition was adopted, would meet with prompt and
effectual correction in the courts in a proceeding prop-
erly instituted for that purpose.

The point is ruled against respondent.

(e). There is a brief by *amici curiae* in aid of
that of the Attorney-General. That brief raises the
point that one of the propositions (or part of the one
proposition) submitted was not authorized by law, viz.,
"For the purpose of putting heating plants in old
school buildings." The point hinges on the statutory
phrase, "for the purpose of erecting schoolhouses and
furnishing the same." [See R. S. 1899, sec. 9752.]
Construing that language, certainly a heating plant
fills the office of "furnishing" a house as much as a
chair, a desk or a stove. We have no call to put a
narrow and illiberal interpretation on that word.
Now, what do the words "furnishing the same" mean?
Do they mean furnishing *new* schoolhouses—the pre-
cise ones to be erected by the bond issue and no other?
Does the statute mean that a school district may bor-
row money to build a new schoolhouse and furnish the
same new schoolhouse, but has no power to borrow

money to put heating plants in old school buildings, thus making them inhabitable for use in educating the children of the district? We think the language used by the lawmaker cannot be justly interpreted that way. To our minds the statutory phrase is the same as if it read that bonds may be issued "for the purpose of erecting schoolhouses and furnishing schoolhouses." By that interpretation the lawmaker is protected from absurdity, the statute is made to accord with common sense, and the words "the same" are made to refer to schoolhouses generally as an antecedent.

We are justified in concluding that our learned Attorney-General entertains the same view, because he does not make the point made by counsel who appear as "Friends of the Court." He merely uses the furnishing of heating plants for the old building to accentuate and emphasize the doubleness of the proposition, and, as we read his brief, does not contend that the furnishing of a heating plant for the old school buildings was not contemplated by the statute. So far as he makes any contention on the point it is merely that it should have been submitted as a separate and distinct proposition. That view of it is sufficiently disposed of in what we have said heretofore.

The premises all considered, we are of opinion the demurrer should be overruled. As the case is submitted on demurrer, it follows that an absolute writ of mandamus should issue. Accordingly, the demurrer is overruled and one is ordered. *Gantt,* *Woodson* and *Kennish, JJ.,* concur; *Valliant, J.,* dissents; *Graves, J.,* dissents for reasons expressed by him in dissenting opinion in State ex rel. Memphis School Dist. v. Gordon, 223 Mo. 6; *Burgess, C. J.,* not sitting.