In the Matter of Proceedings Against PAUL RICHARDS For Disbarment.—63 S. W. (2d) 672.

Court en Banc, October 16, 1933.

(907)

*Glendy B. Arnold* and *J. W. McAfee* for complainants.

*Don Purteet* and *Paul Richards* for respondent.

910

ATWOOD, J.—This is an original proceeding in the Supreme Court to disbar Paul Richards who has been duly licensed by that court to practice law in Missouri. It was instituted by the filing of a verified complaint on behalf of the grievance committees of the Bar Association of St. Louis and the Missouri Bar Association charging that the said Richards "has been guilty of a misdemeanor and malpractice in his professional capacity" in certain particulars specified in the complaint in violation of the statutes of this State and amounting to "such conduct upon his part as to disqualify him from further acting as an attorney at law."

Citation was duly issued and served upon respondent Richards, who thereupon filed motion to dismiss; answer and special plea in bar. The motion to dismiss and the special plea in bar were taken with the case, and it appearing to the court from the complaint and respondent's answer to the citation that issues of fact were joined, Honorable Scott R. Timmons, a duly licensed and practicing attorney under the laws of this State, was appointed special commissioner to take testimony thereon and certify the same to this court. Respondent thereupon filed motion to set aside said order of appointment and thereafter when the special commissioner had heard said evidence and certified the same to this court respondent filed motion to suppress said commissioner's return.

■ The principal ground set forth in respondent's motion to dismiss, and vigorously pressed as the first point in his brief, is that this court "has no original jurisdiction in disbarment proceedings." [Secs. 2 and 3, Article VI, of the Constitution of Missouri; 15 C. J., p. 732, sec. 30; 2 R. C. L.; p. 1086, sec. 179; In re Sizer and Gardner,

300 Mo. 369, 254 S. W. 82; and State ex rel. Hopkins v. Daues et al., 6 S. W. (2d) 893, 319 Mo. 733, are cited in support of this contention.]

State ex rel. Selleck v. Reynolds et al., 252 Mo. 369, 158 S. W. 671, was an original proceeding in this court by certiorari directed to the St. Louis Court of Appeals. The Bar Association of St. Louis, through its grievance committee, had filed charges therein for the disbarment of Selleck. The St. Louis Court of Appeals appointed two members of that bar to hear the charges and report thereon. Their report presented a finding of guilty on two of the charges in the petition for disbarment. The commissioners' report was approved by the court and Selleck was disbarred. In the certiorari proceeding, as well as in the disbarment proceeding, jurisdiction of the St. Louis Court of Appeals was attacked on the grounds that the Supreme Court was the only court having power to license attorneys to practice law in this State, that the question of the court's inherent authority to control the conduct of attorneys practicing at its bar did not arise because the acts complained of were not committed in reference to or in connection with any matter pending in that court, and that the jurisdiction of the St. Louis Court of Appeals is limited by constitutional provisions making its character, duties and functions strictly appellate, with certain marked and defined exceptions among which is the power to issue, hear and determine writs of *habeas corpus*, mandamus, *quo warranto*, certiorari and other original remedial writs. Constitutional questions connected with these grounds were properly lodged and pressed in the Supreme Court. While conceding that the case in hand "did not fall within these granted powers" and that the Legislature could not add to the powers named in the Constitution, this court in banc held in the face of all these objections that the St. Louis Court of Appeals possessed inherent power to disbar attorneys licensed to practice law in this State, all of the judges concurring in this holding except BROWN, J., who expressed opposing views in a separate opinion.

In re Sizer and Gardner, 300 Mo. 369, 254 S. W. 82, was an original proceeding in the Supreme Court to disbar attorneys licensed to practice law in this State for alleged acts of malpractice not connected with any case or proceeding pending or heard in this court. The opinion dealt only with the question of jurisdiction which was exhaustively briefed and argued. It was urged then, as respondent urges now, that Sections 2 and 3 of Article 6 of the State Constitution, defining the court's jurisdiction of cases as appellate "except in cases otherwise directed by this Constitution" and conferring upon it "a general superintending control over all inferior courts" and power to issue, hear and determine "original remedial writs," preclude the power to hear and determine disbarment proceedings. By a vote of five to two this court en banc disregarded the contention

and entertained jurisdiction. While the writer of the majority opinion expressed his personal view that (l. c. 377) "on principle this court has no jurisdiction of this case," he further said, "but a majority of the members of this court are of a contrary opinion, and since this court has been holding contrary to my views here expressed for practically a century, I, myself, feel that it would be unwise to overrule the long line of cases extending over so long a period." Although three of the five concurring judges concurred only in the result all five must be considered as sustaining jurisdiction because that was the sole matter in decision. [State ex rel. Hopkins v. Daues et al., 6 S. W. (2d) 893, 897, 319 Mo. 733.] When the case was finally presented on the merits our jurisdiction was again challenged and the writer of the opinion (306 Mo. 365, 370, 267 S. W. 922), which had the full concurrence of four members of the court sitting in banc, therein stated that he was "satisfied with the conclusions reached in Selleck's case upon that question."

Recognizing that the doctrine of this court's inherent power to disbar had the approval of a majority of the court in its last utterance on the subject, counsel for respondent, nevertheless, call attention to the fact that the above mentioned decisions were not without dissent and, invoking the plea said to have been made by Edmund Randolph in the trial of Aaron Burr, that no judge will oppose reconsideration of a subject merely because he has given an opinion on it, which thought is with fine discrimination expressed by Judge LAMM in State ex rel. v. Gordon, 133 S. W. 44, 49, 231 Mo. 547, ask us to re-examine the question. Under the circumstances presented we deem it proper to do so.

In 2 Ruling Case Law, section 179, pages 1086, 1087, it is said: "In the absence of constitutional or statutory restrictions, a court of superior or general jurisdiction has authority to suspend an attorney from practice as such, or to disbar or strike from the rolls an attorney of such court upon proper grounds, because attorneys are officers of the court in which they are admitted to practice."

Also, in 6 Corpus Juris, section 37, page 580, the doctrine of such inherent power is thus stated: "It is well settled that a court authorized to admit an attorney has inherent jurisdiction to suspend or disbar him for sufficient cause, and that such jurisdiction does not necessarily depend on any express constitutional provision or statutory enactment."

In Weeks on Attorneys at Law, section 80, pages 140, 141, it is said: "The power to strike from the rolls is inherent in the court itself. No statute or rule is necessary to authorize the punishment in proper cases. Statutes and rules may regulate the power, but they do not create it. It is necessary for the protection of the court, the proper administration of justice, the dignity and purity of the profession, and for the public good and the protection of clients."

The same doctrine is thus tersely stated in 2 Thornton on Attorneys at Law, section 758, pages 1167-9: "From the very earliest times the right to punish attorneys by suspension or disbarment, as well as for contempt, has been exercised by the courts as an inherent power; indeed, it has been truthfully said that nothing is better settled than the fact of the existence of this power, and that the court may exercise it with as much propriety as if it were embedded in the Constitution or declared by statute, in the absence of restrictive legislation."

The weight of authority in the main confirms the foregoing texts. Among supporting decisions in other jurisdictions are the following: In re Secombe, 19 How. 9, 15 L. Ed. 565; In re Garland, 4 Wall. 333, 18 L. Ed. 366; Randall v. Brigham, 7 Wall. 523, 535, 19 L. Ed. 285; In re Boone, 83 Fed. 944, 948; Conley v. United States, 59 Fed. (2d) 929, 934; In the Matter of Mills, an Attorney, 1 Mich. 392; People v. Weeber, 26 Colo. 229, 231; Wernimont v. State ex rel. L. R. Bar Assn., 101 Ark. 210, 218; In re Peyton, an Attorney at Law, 12 Kan. 398, 404; Farlin v. Sook, 30 Kan. 401, 408, 409; In re Norris, 60 Kan. 649, 659; State v. Mosher, 128 Iowa, 82, 5 Ann. Cas. 984; In re Robinson, 48 Wash. 153, 15 Ann. Cas. 415; Danforth v. Egan, 23 S. D. 43, 20 Ann. Cas. 418; State Bar Com. ex rel. Williams v. Sullivan, 35 Okla. 745, L. R. A. 1915D, 1218, 1223; Gould v. State of Florida (Fla.), 69 A. L. R. 699, 701, 702; State Law Examiners v. Phelan, 43 Wyo. 481, 78 A. L. R. 1317, 1321, 1322; In re Steen (Miss.), 134 So. 67, 69, 70; In re Eaton (N. D.), 235 N. W. 587, 592; Brydonjack v. State Bar of California (Cal.), 281 Pac. 1018, 1020; Barton v. State Bar of California (Cal.), 289 Pac. 818, 819; In re Thatcher, 80 Ohio St. 492, 655; State ex rel. v. Albin, 118 Ohio St. 527, 533; The People v. Peoples Stock Yards Bank, 344 Ill. 462, 471; In re Greathouse (Minn.), 248 N. W. 735, 737-9; State ex rel. Hovey v. Noble et al., 118 Ind. 350; Hutchins v. Des Moines et al., 176 Iowa, 189; In re Simpson, 9 N. D. 379, 404; Splane's Petition, 123 Pa. St. 527; In re License to Practice Law, 67 W. Va. 213; Boston Bar Assn. v. Casey, 211 Mass. 187, 192; In re Opinion of the Justices (Mass.), 180 N. E. 725, 727. See also the scholarly discussions of Chief Justice CARTWRIGHT, in Re Day, 181 Ill. 73, and of Chief Judge CARDOZO in People ex rel. Karlin v. Culkin, 248 N. Y. 465, 60 A. L. R. 851. Missouri decisions to like effect, in addition to the Selleck and Sizer and Gardner cases above mentioned, are as follows: In re Bowman, 7 Mo. App. 567, 568; State ex rel. Jones v. Laughlin, 10 Mo. App. 1; State ex rel. Jewett v. Clopton, 15 Mo. App. 589; State ex rel. Johnson v. Gebhardt, 87 Mo. App. 542, 549; In the Matter of Z——, 89 Mo. App. 426, 433; In re Marshall, 178 Mo. App. 16, 20-24, 160 S. W. 531; State ex rel. Jones v. Laughlin, 73 Mo. 443, 446; State ex rel. Walker v. Mullins, 129 Mo. 231, 237, 31 S. W. 744; State ex rel. Walker v.

Harber et al., 129 Mo. 271, 293, 31 S. W. 889; State ex rel. Lentz v. Fort, 178 Mo. 518, 521, 77 S. W. 741; State ex rel. Larew v. Sale, 188 Mo. 493, 87 S. W. 967. See also State ex rel. Am. Mfg. Co. v. Anderson, 270 Mo. 533, 537, 540, 545, 194 S. W. 268, on inherent power of courts.

■ The doctrine of inherent power of courts to admit and disbar attorneys is sometimes denied on the theory that in the distribution of state governmental power executive and judicial departments are invested by grant, whereas, by limitations placed on the legislative department the people reserve certain power to themselves, so that all governmental power not thus expressly granted. or reserved is vested in the Legislature. From this it is argued that if the power to create and regulate a bar is not granted to the judicial department or reserved to the people by limitation on the legislative department it is vested in the Legislature, and that all judicial power being granted power it is derivative and cannot be inherent.

In 1 Andrew's American Law (2 Ed.), page 423, and in 12 Corpus Juris, section 167, page 748, note 8, sections 236, 237, pages 804, 805, notes 37, 48 and page 873, state constitutions are referred to as instruments of grant as to executive and judicial powers and of limitation as to legislative power. It would seem that such generalization must yield to the language of the particular Constitution under consideration, and no such distinction appears in Missouri's constitutional delegation of legislative and judicial powers. The legislative power, subject to the limitations in the Constitution contained, is "vested in a Senate and House of Representatives, to be styled 'The General Assembly of the State of Missouri.' " The judicial power, as to matters of law and equity, except as in the Constitution otherwise provided, is "vested in a Supreme Court, the St. Louis Court of Appeals, circuit court, criminal courts, probate courts and municipal corporation courts." [Sec. 1, Art. IV and Sec. 1, Art. VI, Mo. Const.] Each power is thus by general grant "confided to a separate magistracy" as provided in Article III, and both are parts of the political power "vested in and derived from the people" (Sec. 1, Art. II of Mo. Const.), and distributed by the provisions of Article III. So in this State, if either department can be said to obtain its power by grant the same can be said of the other department, and the powers of both are obviously derived from the people. Nevertheless, both departments are commonly spoken of as possessing inherent powers, and regardless of the soundness of these observations or the syllogism above stated, it is a fundamental principle of constitutional law that each department of government, whether Federal or State, "has, without any express grant, the inherent right to accomplish all *objects naturally within the orbit of that department,* not expressly limited by the fact of the existence of a similar power elsewhere or the express limitations in the Constitution."

[1 Andrew's American Law (2 Ed.), sec. 182, p. 221; Legal Tender Cases, 79 U. S. 457, 532, 556, and cases heretofore cited.]

■ It is not always easy to determine what objects are naturally within the range or orbit of a particular department of government, but it will scarcely be denied that a primary object essentially within the orbit of the judicial department is that courts properly function in the administration of justice, for which purpose they were created, and in the light of judicial history they cannot long continue to do this without power to admit and disbar attorneys who from time immemorial have in a peculiar sense been regarded as their officers. Since the object 'sought is not naturally within the orbit of the legislative department the power to accomplish it is in its exercise judicial and not legislative, although in the harmonious co-ordination of powers necessary to effectuate the aim and end of government it may be regulated by statutes to aid in the accomplishment of the object but not to frustrate or destroy it. [2 Thornton on Attorneys at Law, sec. 759, p. 1170; In re Opinion of the Justices (Mass.), 180 N. E. 725, 727; In re Greathouse (Minn.), 248 N. W. 735, 739; In re Eaton (N. D.), 235 N. W. 587, 592; State Law Examiners v. Phelan (Wyo.), 78 A. L. R. 1317, 1321, 1322; Gould v. State (Fla.), 69 A. L. R. 699, 702; Brydonjack v. State Bar of California (Cal.), 281 Pac. 1018, 1020; dissenting opinion of LAMM, J., in Railroad v. Gildersleeve, 219 Mo. 170, 188 et seq., 118 S. W. 86, afterward approved in majority opinion in Ex parte Creasy, 243 Mo. 679, 708, 148 S. W. 914. See, also, dissenting opinions of WOODSON and LAMM, JJ., in State ex rel. v. Reynolds, 252 Mo. 369, 403 et seq., 158 S. W. 671.]

■ Since this power as to judicial matters naturally belongs to the judicial department and is not expressly lodged elsewhere in the Constitution, it remains for us to determine whether it is excluded or restricted by any constitutional provision. Counsel for respondent say that it is excluded as to the Supreme Court by the provisions of Sections 2 and 3 of Article VI which allot "appellate jurisdiction only" to that court together with "general superintending control over all inferior courts" and "power to issue writs of habeas corpus, mandamus, quo warranto, certiorari and other remedial writs, and to hear and determine the same," and such in effect were the minority views in the Selleck and Sizer and Gardner cases. The contention apparently grows out of the thought that disbarment is an adversary proceeding between parties which must fall within or without the allotted jurisdiction of cases. This is an erroneous conception. Disbarment is not an adversary proceeding in that sense. As said in 2 Thornton on Attorneys at Law, section 760, page 1171, note 14, "the inquiry is always in the nature of an investigation by the court into the conduct of one of its officers, and the exercise of disciplinary jurisdiction." In Fairfield County Bar v. Taylor, 60 Conn. 11, 15,

it is said that such a proceeding is "an investigation by the court into the conduct of one of its own officers, not the trial of an action or suit." Also, In re Bowman, 7 Mo. App. 569, quoted with approval in State v. Peck (Conn.), Ann. Cas. 1917B, 227: "The proceeding to disbar an attorney is neither a civil action nor a criminal proceeding, but is a proceeding *sui generis,* the object of which is not the punishment of the offender, but the protection of the court." [Also see In re Marshall, 178 Mo. App. 16, 21, 160 S. W. 531; In the Matter of Z—, 89 Mo. App. 426, 435; Wernimont v. State ex rel. L. R. Bar Assn., 101 Ark. 210, 216; In re Baum (Idaho), 186 Pac. 927; Bar Assn. of the City of Boston v. Casey, 211 Mass. 187, 192; Morton v. Watson (Neb.), 84 N. W. 91; In Matter of Application for Disbarment of Ault, 15 Wash. 417; State ex rel. v. Martin, 45 Wash. 76, 83; State ex rel. Kehoe v. McRae, 49 Fla. 89, 6 Ann. Cas. 580, 581; In re Steen (Miss.), 134 So. 67, 69, 70; In re Wellcome, 29 Mont. 213, 227; In re Smith, 73 Kan. 743, 753; Ex parte Wall, 107 U. S. 265; State Bar Comm. v. Sullivan, 35 Okla. 745, L. R. A. 1915D, 1218, 1221; Gould v. State (Fla.), 69 A. L. R. 699, 701; 2 R. C. L., sec. 180, pp. 1088-9.] We find nothing in the foregoing sections or elsewhere in the fundamental law tending to exclude, limit or withhold such power from the courts.

It may be that in the analysis of powers delegated under written constitutions it is not strictly accurate to speak of this right or power as inherent (15 C. J., sec. 30, p. 732), but metaphysical distinctions are not always helpful in the administration of justice. In a very practical sense this power, whether deemed inherent or implied, naturally belongs to each department of government and to each "separate magistracy" to which the power expressly delegated is confided. The term inherent is aptly descriptive of the identical power that was exercised by like agencies long before written constitutions were adopted, and inasmuch as the power still persists in full vigor in each of the three great branches of government its historical designation will hardly be abandoned, though for the purposes of this discussion the choice of adjectives is unimportant. The vital fact is that such power, independent of express grant either constitutional or statutory, exists in the judicial branch of government and, therefore, in courts which constitute the "separate magistracy" to which the judicial power is expressly confided.

█ Recurring to other points urged by respondent we find that his special plea in bar consists of a repetition of the jurisdictional attack just disposed of, and a charge that assumption of jurisdiction is in violation of certain provisions of the Federal Constitution. Inasmuch as no constitutional objections are urged or in any way kept alive in respondent's brief they must be treated as abandoned and the special plea in bar overruled.

█ Respondent's motion to set aside order appointing special

commissioner to hear testimony is urged on the ground that the commissioner is disqualified by reason of the fact that he is a member of a bar association preferring charges against respondent. State ex rel. Scott v. Smith et al., 176 Mo. 90, 75 S. W. 586, is cited, in support of this point. In that proceeding the attorney at law proceeded against filed an application for a change of venue on the grounds that the judge before whom the matter was pending was an active member of the Kansas City Bar Association, and was therefore interested in said cause, *and was also personally prejudiced against him and that he could not have a fair trial before him.* The application was denied, the evidence heard and judgment of disbarment entered. The matter went to the Kansas City Court of Appeals where it was treated as upon a trial *de novo* and judgment of disbarment was entered. It was then brought to this court on writ of certiorari. Our opinion quotes the opinion of that court and in the course of the latter the following appears: "When the attention of the learned trial judge was called to the fact that he was a member of the bar association, the complainant, and an active prosecutor in the matter, and was therefore interested therein, . . . it became his duty *sua sponte,* under Section 819, Revised Statutes 1899, to award a change of venue to some other division of the Jackson Circuit Court." In our opinion we said that the "affidavit for a change of venue, whether true or false in point of fact, must be taken as true, and the Court of Appeals correctly held that it was error to refuse his application to change the venue." In the light of all averments in the affidavit it does not appear that we intended to rule or did in fact rule that the mere membership of the trial judge in a bar association, the individual members of a committee of which filed and prosecuted the disbarment proceeding, disqualified him from sitting therein. In Bowman's case, 67 Mo. 146, 150, 151, we held that the judge's position, as an honorary member of the bar association committee members of which were the prosecutors in a disbarment proceeding, "did not disqualify him from sitting in the case, since he had not a particle of pecuniary interest involved." In Ex parte State Bar Assn., 92 Ala. 113, 117, 118, it was held that the judge, though paying dues that might be appropriated to the payment of the costs of a disbarment proceeding prosecuted in its name, was not thereby disqualified from sitting in such proceeding. [Also see Ex parte Lewis, 288 Pac. 354, and Boston Bar Assn. v. Casey, 211 Mass. 187, 191-3.] Certainly the commissioner in this proceeding, whose authority did not extend beyond the taking and returning of testimony therein, was not by reason of his membership disqualified from performing this service. The motion to set aside the order of appointment is overruled.

Respondent next insists that his motion to suppress the commissioner's return should be sustained on the ground that the

918

order appointing him deprived respondent of his right to have the credibility of the witnesses passed upon in that the commissioner, who alone had an opportunity to hear and observe the conduct of the witnesses on the witness stand, was not required to state findings of fact and conclusions of law. Section 11713, Revised Statutes 1929, providing for a special commissioner, makes no such requirement. Furthermore, this is an original proceeding in which the court alone must determine the weight and credibility of the evidence. Findings of facts and conclusions of law by a special commissioner might lighten this labor but they would not be binding upon the court and could not be claimed as of right. We do not think that respondent's defense was prejudiced on account of the matter of which he now complains. The motion to suppress is overruled.

■ Coming at last to the principal pleadings herein we find the charges against respondent fully set forth in paragraphs II, III and IV of the complaint. The substantial averments in paragraph II are that respondent accepted a retainer fee of $1,000 from one Alexander Berg, who was then being forcibly held by kidnapers for ransom, for services to be performed by respondent as a go-between for Berg and his kidnapers in securing Berg's release; that prior to such employment the kidnapers had secretly communicated with respondent and informed him that they would negotiate with him for Berg's release upon payment to him of said $1,000 and the payment of a note made payable to respondent for $50,000 which they had forced Berg to sign and had delivered to respondent for collection agreeing with respondent that he might retain $10,000 thereof as additional compensation for his services as such go-between; that respondent accepted said employment and retainer from Berg, through Berg's personal attorney Morris Levinson, and entered upon his duties as go-between with the knowledge that such employment was the result of the unlawful acts of the kidnapers and not a free and voluntary employment on the part of Berg, and with the expectation on the part of respondent that he would receive said additional sum of $10,000 from the kidnapers. The substantial averment in paragraph III is that respondent accepted employment from said kidnapers and agreed with them that he should be given $10,000 of the $50,000 collected on said ransom note. The substantial averments of paragraph IV are that respondent, while pretending to accept employment as attorney for Berg and his family, and while pretending to embark upon the rendering of legal services for them, and while accepting the relationship of attorney and client with them, in fact used the worry and harrassment under which said parties were then laboring to make such arrangements as would enable him to collect the total sum of $11,000 upon the release of the said Berg; and that respondent failed to disclose to his associate, the said Levinson, important matters of fact which had come into

his hands and which, if so disclosed, would have been of great value in handling the matter and in causing the apprehension and arrest of said kidnapers. By reason of said acts respondent is alleged to be guilty of a misdemeanor and malpractice in his professional capacity, and the prayer of the complaint is that this court remove him "from the practice of law in the courts of this State and as a member of the bar of this State, and that the license of said Paul Richards to practice law be canceled and for such other orders and directions as to the court may seem meet and proper."

In his answer respondent admits that he is an attorney duly licensed to practice law in the courts of this State, and that "on or about November 10, 1931, one Morris Levinson, an attorney at law, of St. Louis, Missouri, paid him a retainer fee of one thousand dollars ($1,000) for the purpose of enlisting his services in endeavoring to secure the return of one Alex Berg, a resident of the City of St. Louis, Missouri, reported to have been abducted, restrained and held for ransom," but denies each and every other allegation contained in said complaint. Further answering, respondent states that the said Morris Levinson agreed to pay him the additional sum of ten thousand dollars ($10,000) in the event that respondent was successful in effecting the return of the said Berg; that although respondent was successful in his employment and succeeded in restoring the said Berg to his family, no part of said contingent fee was ever paid him. Further answering, respondent pleads as a defense his acquittal in this State on an indictment charging him with the crime of kidnaping the said Berg for ransom on the 6th day of November, 1931, asserting that the facts alleged in paragraphs numbered II and III of said complaint are the same alleged facts upon which respondent was tried and acquitted under said indictment. By way of further defense and justification other averments are made and matters of evidence are pleaded at length in respondent's answer, to which such reference will hereinafter be made as may be deemed necessary.

We shall consider respondent's plea of acquittal first. The statutory reasons for suspension or disbarment of attorneys in this State are set forth in Section 11707, Revised Statutes 1929, which is as follows:

"Any attorney or counselor at law may be removed or suspended from practice in the courts of this State for any of the following reasons: First, if he be convicted of any criminal offense involving moral turpitude; second, if he unlawfully retain his client's money or if he is guilty of any malpractice, fraud, deceit or misdemeanor whatsoever in his professional capacity; third, if he shall have been removed, suspended or disbarred from the practice of law in any other state or jurisdiction and shall fail to disclose such fact in his application for license to practice law in this State."

In performing the acts alleged in paragraphs II and IV of the complaint respondent is therein alleged to be guilty of "a misdemeanor and malpractice in his professional capacity." The performance of the acts alleged in paragraph III of the complaint is therein alleged to have "amounted to professional misconduct on the part of Paul Richards and was in violation of the statutes of this State, and was such conduct upon his part as to disqualify him from further acting as an attorney at law." It thus appears that in paragraphs II and IV respondent is charged under the second classification of the reasons stated in the above statute for which an attorney may be removed or suspended, while in paragraph III respondent's disbarment is sought on the ground that the acts therein alleged amount to professional misconduct in violation of the statutes of this State, and on the further ground that such conduct on his part disqualified him from further acting as an attorney at law.

Now respondent contends that certain of the acts alleged in paragraphs II and III of the complaint in effect charge him with the commission of a "criminal offense involving moral turpitude," conviction of which is the first reason for disbarment named in the statute, and that having been acquitted on such a criminal charge based on the same acts such acts may not be charged and proved as reasons for his disbarment. Assuming without deciding that the indictment was based on the acts referred to, it certainly does not follow that after acquittal thereon these same acts may not be charged and proved as reasons for disbarment if they in fact show that respondent is unfit to continue in the practice of law. ■ The great weight of authority is that statutory grounds of disbarment are not exclusive. [State ex rel. Selleck v. Reynolds, 252 Mo. 369, 382, 158 S. W. 671; In the Matter of Z—, 89 Mo. App. 426, 433; State ex rel. Johnson v. Gebhardt, 87 Mo. App. 542, 549; State ex rel. Jewett v. Clopton, 15 Mo. App. 589; State ex rel. Jones v. Laughlin, 10 Mo. App. 1, 3; 2 Weeks on Attorneys at Law, sec. 80, p. 141, n. 2; 2 Thornton on Attorneys at Law, sec. 759, p. 1170, n. 4; Boston Bar Assn. v. Greenhood, 168 Mass. 169, 183; In re Mills, 1 Mich. 394; In re Wellcome, 23 Mont. 213, 225, 226; In re Smith, 73 Kan. 743, 748; State Bar Commission ex rel. Williams v. Sullivan, L. R. A. 1915D, 1218; In re Thatcher, 80 Ohio St. 492, 654, 655; State ex rel. v. Albin, 118 Ohio St. 527, 532, 533; In re Opinion of the Justices (Mass.), 180 N. E. 725, 727; In re Greathouse (Minn.), 248 N. W. 735, 737.] Furthermore, we can think of no good reason why any misbehavior by respondent "in his professional capacity," even though it reach the gravity of a "criminal offense involving moral turpitude," is not a proper matter for investigation and disbarment as "a misdemeanor and malpractice in his professional capacity." Long ago the St. Louis Court of Appeals very sensibily held that "the words, 'misdemeanor in his professional

capacity,' in the Missouri statute as to attorneys-at-law, are not used in the technical sense of offenses punishable by fine and imprisonment in jail, but as the equivalent of professional misbehavior.'' Criminal conviction of the graver offense is sufficient reason for disbarment without other investigation or determination because the retention as an officer of the court of one so convicted would be inimical to the public confidence and esteem so essential to courts in the efficient administration of justice. On the other hand though for one reason or another such criminal proceeding results in an acquittal, the acts charged may be a proper matter for investigation and disbarment under other provisions of the statute or independent of the reasons named in the statute.

It is true that by a bare majority this court once held, in construing a statute then in force, that ''it was never contemplated that the court before which the disbarment proceedings were pending should ascertain the facts in a case where the charges reached the gravity of indictable offenses,'' and that the record from the court having charge of the criminal proceedings was binding upon the court hearing the disbarment proceedings whether it showed acquittal or conviction. [State ex rel. Selleck v. Reynolds, 252 Mo. 369, 383, 158 S. W. 671.] The fallacy of this majority holding was clearly indicated in two dissenting opinions. ▓▓▓ As heretofore stated, disbarment is not a criminal proceeding. Its purpose is not to punish but to ascertain those whose conduct has demonstrated their unfitness to practice law and to deprive them of their previously acquired right to serve as officers of the court, and the inquiry is not limited to conduct in the presence of the court or to matters connected with a case in court. Any statutory enactment undertaking to make an acquittal in a criminal prosecution a bar to such an investigation would be, as heretofore suggested, an unconstitutional encroachment of the legislative upon the judicial department of government, and such is the weight of well reasoned authority. [In re Platz, 42 Utah, 439, 443; People v. Mead, 29 Colo. 348; People v. Weeber, 26 Colo. 229; People v. Thomas, 36 Colo. 126; In the Matter of ———, an Attorney, 86 N. Y. 563, 569, 573; In re Wellcome, 23 Mont. 213, 224; People ex rel. Black v. Smith, 290 Ill. 241, 9 A. L. R. 183, 186; Re Snyder's Case, 301 Pa. St. 276, 76 A. L. R. 666, 671, and annotation at p. 674 et seq. as to indictments pending; Barach's Case, 279 Pa. 89, 95; Wolfe's Disbarment, 288 Pa. St. 331, 50 A. L. R. 380, 383; Re O'Brien (Vt.), 14 A. L. R. 859.] A few years after the majority opinion in the Selleck case was handed down the General Assembly removed the excuse for this judicial aberration by repealing Section 956, Revised Statutes 1909, and enacting a new section in lieu thereof (Laws 1919, pp. 151-3), now Section 11712, Revised Statutes 1929, the pertinent provisions of which are as follows:

"If the charge allege a conviction for any criminal offense involving moral turpitude, the court shall, on production of the record of such conviction, remove the attorney so convicted or suspend such attorney from practice for a limited time, according to the nature of the offense, as the court may deem just, and without further trial. If the attorney be acquitted or discharged upon his trial, or if he be charged under the second, third or fourth clause of 11707, and appears at the time fixed by court and denies the charges preferred against him, or having been notified as required by Section 11709 or 11710, fails to appear, the court shall forthwith hear the evidence offered in support of said charge and the evidence offered by the accused, and shall determine the matter without delay."

Counsel for respondent suggest that the above portion of Section 11712 which refers to the acquittal or discharge of an attorney "can be construed in only one logical, reasonable and equitable way—that is, that it refers to the acquittal or discharge of an attorney of some offense which does not involve moral turpitude." The legislative intent is too plain to admit of any such construction. The acquittal or discharge must be "upon his trial" and the only trial mentioned or referred to in the statute is one for a "criminal offense involving moral turpitude." The last sentence above quoted obviously means as heretofore stated, that notwithstanding such acquittal or discharge, evidence as to the commission of acts upon which the criminal prosecution was based may be heard and determined in a proceeding to remove or suspend an attorney if appropriately charged either under or independent of the statute.

Conceiving the acts alleged in the complaint to be unaffected, for the purposes of this proceeding by respondent's acquittal in the criminal proceeding, we come now to the evidence pleaded in respondent's answer and that reported by the special commissioner.

In his answer respondent states that on November 9, 1931, at about one-thirty P. M., he received a telephone call from John Rogers, a reporter employed by the St. Louis Post-Dispatch, in which Rogers stated that he had something very important that he wanted to talk to respondent about; that respondent told Rogers to come to his office and that when he arrived he said:

"Paul, I have just come from Mr. Levinson's office. I suppose you have read about the Berg case in the paper. Mr. Levinson has just received a letter signed by Mr. Berg, directing that he employ you to represent his family in trying to get him back. That is what I am over here about. The letter said some one was going to get in touch with you."

That respondent thereupon told Rogers that no one had been in touch with him, but that he had received a special delivery letter a few minutes before Rogers called him; that respondent exhibited this letter to Rogers, the same being an envelope containing what

purported to be a promissory note in the sum of fifty thousand dollars ($50,000), payable to respondent and bearing the name of Alex Berg as maker; that respondent told Rogers that this so-called note meant nothing to him; that the following conversation then occurred between Rogers and respondent:

"ROGERS: Well, won't you accept employment here?

"RESPONDENT: Well, I will on one condition. Do you know Mr. Levinson?

"ROGERS: Yes; I know Mr. Levinson quite well.

"RESPONDENT: Can he be trusted?

"ROGERS: Yes; he can.

"RESPONDENT: Then you can tell Mr. Levinson I will accept employment if they will pay me a retainer fee of a thousand dollars, and if they will pay me an additional fee of ten thousand dollars after Mr. Berg is successfully delivered safe and sound, in the event I am able to accomplish the purpose of my employment."

That Rogers said he would take this message to Mr. Levinson and communicate with respondent later in the day; that about four o'clock P. M., of the same day respondent received a telephone call from one Charles Heuer and that the following conversation took place:

"HEUER: Have you been employed to represent the Berg family?

"RESPONDENT: No; I haven't.

"HEUER: You will. I am dealing for the people that have Mr. Berg; I am speaking for them.

"RESPONDENT: Well, I don't know and I probably won't know for another day whether I am going to represent the Berg family or not. How much money do your friends want?

"HEUER: They want fifty thousand dollars; they did want seventy-five, but they insist on fifty.

"RESPONDENT: When can they produce Mr. Berg?

"HEUER: In a short time.

"RESPONDENT: Well, that is all I know about it at this time.

"HEUER: Well, I will call you tomorrow about noon."

That about 4:30 o'clock of the same afternoon respondent received a telephone call and the following conversation took place between respondent, Rogers and Morris Levinson.

"ROGERS: Paul, Mr. Levinson is here. I want you talk to him.

"LEVINSON: Is this Paul Richards?

"RESPONDENT: Yes.

"LEVINSON: This is Morris Levinson. I have just talked to Mr. Rogers. The arrangements are satisfactory.

"RESPONDENT: What?

"LEVINSON: Everything is all right; all right; everything is all right.

"RESPONDENT: That's fine.

"Levinson: Can you come to my office at 10 o'clock tomorrow morning?

"Respondent: Yes, sir.

"Levinson: Will you do what you can to see that no harm comes to Mr. Berg?

"Respondent: I will. Is Mr. Rogers there? Put him on the phone.

"Rogers: This is John, Paul.

"Respondent: John, I have an appointment with Mr. Levinson at 10 o'clock tomorrow morning; can you come by my office at 9:30, and we will go over there together?

"Rogers: Yes; I will do that. Listen, old man, do what you can and see that nothing happens to Mr. Berg.

"Respondent: I will do anything I can.

"Rogers: I will see you tomorrow morning at 9:30."

That about 9:30 o'clock in the morning of the next day respondent received a telephone call from Levinson in which he told respondent that Rogers had been called to Chicago, and requested respondent to come to his office; that respondent went to Levinson's private office and after some generalities the following conversation took place.

"Levinson: Are you ready and willing to accept a thousand dollars from me as a retainer fee from the Berg family?

"Respondent: Yes, sir.

"Levinson: ('Opening desk drawer and taking out two packages, which he handed to respondent.) There is five hundred dollars in each package in ten and twenty dollar bills.

"Levinson: (continuing) Fifty thousand dollars is a lot of money.

"Respondent: Yes, it is, Mr. Levinson.

"Levinson: Eleven thousand dollars is a nice fee for you to get.

"Respondent: It is.

"Levinson: Do you know how he will be released?

"Respondent: I don't know any more about it than you do. I don't know any of the details at this time. If I am questioned about this matter I am going to tell that I have been employed by the Berg family.

"Levinson: That is perfectly all right, but don't bring my name into it; I want to stay out of this. Whatever we do, we don't want the police to know anything about this, because if they do it is liable in some way to interfere with Mr. Berg's safekeeping. My only desire, and all I am asking of you, is that you assist in getting Mr. Berg back safe and sound."

That Levinson further told respondent that he did not want to pay any ransom money until after Berg had been returned; that about noon of the same day respondent received another telephone

call from Charles Heuer and that the following conversation took place:

"HEUER: Have you been employed by the Berg family yet?"

"RESPONDENT: Yes; I now represent the Berg family.

"HEUER: What do they want to do about the ransom?

"RESPONDENT: They don't want to pay any ransom money out at all until after Mr. Berg has been returned safe and sound.

"HEUER: Will they pay the money then?

"RESPONDENT: Mr. Levinson told me they would.

"HEUER: Well, we are willing to take your word for it.

"RESPONDENT: All right; but I haven't got the money yet; I don't know anything about it, anything about the details of it. Can you give me any idea where or when you will release Mr. Berg?

"HEUER: I can't at this time. I will call you at 5 tonight."

That about 4:15 o'clock in the afternoon of the same day respondent received a telephone call from Levinson requesting him to come to his office; that respondent went and Levinson wanted to know when and where Berg would be released; that respondent told him he would not know until five o'clock, when he was to receive a telephone call; that respondent told Levinson that the abductors wanted to know about the fifty thousand dollars; that thereupon the following conversation took place:

"LEVINSON: That is all right. You know John Rogers?

"RESPONDENT: Yes.

"LEVINSON: Well, I trust him, too.

"RESPONDENT: I do, too.

"LEVINSON: I will give John Rogers the money tomorrow morning, and you wait at your office, and he will bring it over there."

That about 5:15 that afternoon respondent received another telephone call from Heuer and the following conversation took place:

"HEUER: Have you got a pencil and paper?

"RESPONDENT: Yes.

"HEUER: Well, now, the place is Hamilton and Roosevelt place; the time is 11:45. Now, I want you to write these things down: Deliver $11,000 to a man named Eyerkuss, at 18— North Twentieth street; his telephone number is ——; deliver $500 to my brother, John Heuer, 72— North Broadway; deliver $3,000 to a man named George Peak at the LaSalle Hotel and tell him to keep that until some one calls for it.

"RESPONDENT: All right.

"HEUER: Bring the balance of the money to Kansas City, register at the Baltimore Hotel, wait until you hear from me or until some one calls you and says it is 'Blackie.'"

That Heuer thereupon hung up the telephone and respondent went right over to Levinson's office; that Levinson took respondent to the library in his office, and the following conversation occurred:

"RESPONDENT: The time is 11:45, and the place is Hamilton avenue and Roosevelt place.

"LEVINSON: Where is Roosevelt Place?

"RESPONDENT: I don't know; have you a city directory?

"LEVINSON: Yes, right there (pointing to a shelf).

"RESPONDENT: (After thumbing directory) There it is, 2800 north.

"LEVINSON: Let's write that down (tearing off a slip of paper from an adding machine); will you put it down?"

That respondent wrote it down on the slip of paper, and that Levinson then turned the slip over and drew a picture of two street intersections on the back and said:

"LEVINSON: Can you point out where Mr. Berg will be released?

"RESPONDENT: I don't know anything about that at all; all I know is that's the time and place.

"LEVINSON: All right; you wait at your office tomorrow morning and Mr. Rogers will be over there with the money."

Berg died before any evidence was heard in this proceeding, but what was conceded to be a correct transcript of his testimony given at respondent's second trial when he was acquitted upon the joint indictment found against him and five others, including Heuer, charging them with kidnaping Berg on November 6, 1931, was introduced in evidence. From this it appears that Berg was a prosperous fur merchant residing at the Park Plaza Hotel in St. Louis, Missouri, and having his place of business at 300 North Main Street; that abou' five-thirty o'clock in the afternoon of said date he left his place o° business in his automobile for home accompanied by his chauffeur; that at Euclid and York Avenues he was forcibly kidnaped by two men who entered the car and under threat of death took him to another part of the city where he was held under duress until released about midnight on November 10, 1931, pursuant to the plan above outlined in respondent's answer; that while he was so held his kid-napers compelled him to write a letter to a friend, Ben Harris, telling him to raise sixty-five thousand dollars or they would kill him; that they also compelled him to write several letters to his personal attorney, Morris Levinson, and one to an attorney unknown to Berg by the name of Joseph Lemen; that in the letter to Lemen they compelled Berg to tell him that he should act as go-between for them and Berg's family to collect money and that if he did not they would kill him and his family; that he was compelled to enclose some notes in the letter to Lemen, one of which he thought was for $20,000 and the other for $50,000; that one of his captors told him the next day that Lemen had refused to act and that they were going down there and shoot up his house; that about three o'clock Monday morning November 9th, they prepared draft of another letter to Levinson and forced him to copy, sign and address same. This was the

special delivery letter received by Levinson about one-thirty o'clock in the afternoon of that day and referred to in the early part of respondent's answer. This letter is as follows:

"Mr. Morris Levinson

   "St. Louis Mo.

"Dear Sir

   "I want you to hire Paul Richards to represent me and handle the negotiations for my release pay him about a thousand dollars and I will pay you back. try to get him to get Bussy at once. some one will get in touch with him soon

"(Signed) ALEX BERG"

Also at the same time they compelled him to copy and sign a promissory note payable to Paul A. Richards in the sum of fifty thousand dollars and enclose same in an envelope, forcing him to address the envelope to Paul A. Richards from one of Richards professional cards which they handed him, this being the note received by respondent by special delivery letter in the afternoon of the same day and referred to in his answer, said note being in words and figures as follows:

"St. Louis Mo<br>"Nov 9/31

   "I promise to pay to Paul A. Richards the sum of Fifty Thousand Dollars on demand

"(Signed) ALEX BERG"

Respondent voluntarily took the stand at the hearing before the special commissioner and without substantial variation related under oath the evidentiary facts above quoted from his answer. He also admitted that he had read of the Berg kidnaping before Rogers first called him in the afternoon of November 9th and had reason to believe that Berg was being held for ransom, but had no personal knowledge of the fact. It appears from the telephone conversation he admits having had with Charles Heuer the same afternoon that before he ever talked to Levinson he had very definite information that Berg was being so held and that the ransom then demanded was fifty thousand dollars. Respondent's own admissions thus show that he not only accepted $1000 from Berg, through his personal attorney Levinson, with the information and belief that Berg was then under duress and acting in conformity with the wishes of his captors, but that he took advantage of Berg's helpless condition and the consequent mental anguish of his family to exact a promise to pay him an additional sum of ten thousand dollars contingent upon the success of efforts he proposed to render in effecting Berg's release. We are not called upon to rule the question whether in such negotiations and in his undertaking pursuant thereto he was acting "in his professional capacity," because in his answer respondent avers "that in his dealings with Morris Levinson he was arranging

in good faith for legitimate payment for legal services to be rendered,'' and for the purposes of this proceeding he is bound by the admission.

Upon this state of the record certain questions naturally arise. How did the kidnapers happen to have respondent's professional card, and why did they force Berg to name him, who was wholly unknown to Berg, as the person to whom Levinson should pay "about a thousand dollars,'' and why did the kidnapers force Berg to name him as the payee in the fifty thousand dollar note which they compelled him to sign and send by special delivery letter to respondent, and why did they have such implicit confidence in respondent as to make him their "pay-off'' man? Respondent attempted no explanation, although he admitted on cross-examination that he "had represented Mr. Heuer in a minor case in St. Louis County.''

The testimony of John T. Rogers and Morris Levinson sheds considerable light on these questions. Rogers testified that he was in Levinson's office in the early afternoon of November 9th when the above-quoted letter from Berg arrived, and that he read it; that he then went over to see Richards, whom he had previously known, and told him that Levinson had received a letter signed by Berg requesting him to employ Richards to represent Berg to effect his release and to pay Richards $1000 as a fee for that service; that Richards said he "also had received a letter and had a telephone message the night before;'' that Richards took from his pocket a letter and handed it to him, which he read; that it was a promissory note for $50,000 made out to Richards and signed "Alex Berg;'' that Richards said the note was no good to him in that form but that he could have Berg released by the kidnapers in two hours for $50,000; that a client of his was the leader of a gang, and that he was a man he had gotten out of trouble in Indianapolis and also in St. Louis County; that he asked Richards if the $1,000 which Berg had requested Levinson to pay him was all he was to get out of it and he said no, he was to get $11,000 of the ransom; that Richards said he did not know whether he wanted to talk to Levinson or not, but finally agreed to meet Levinson if Rogers would guarantee him to be "all right.'' Rogers flatly denied that Richards told him that he could tell Levinson "I will accept employment if they will pay me a retainer fee of $1,000 and will pay me an additional fee of $10,000 after Mr. Berg is delivered safe and sound in the event I am able to accomplish the purpose of my employment.'' He also denied having made the statement to Richards, set forth in his answer, to the effect that other big lawyers had paid rewards in similar cases and he did not see how Richards "could get in any trouble.'' Rogers further testified that "towards the end of our conversation Mr. Richards told me that the thing that worried him was that he might get 'burned up' if he handled the ransom money, but he said he

would find a way to get away with that;" that the men who were holding Berg were desperate men who might kill Berg or shoot Rogers or him if the ransom was not paid. He further testified that he reported this conversation to Levinson and later in the afternoon got Levinson and Richards together over the telephone; that he also engaged in that conversation and when he asked Richards to tell the men who had Berg not to hurt him, Richards replied: "I will go right out and do that very thing."

Morris Levinson testified that he had known Alexander Berg for twenty or twenty-five years and had been his lawyer for several years; that on Monday afternoon, November 9, 1931, after receiving the above-quoted letter from Berg he communicated with Paul Richards, whom he had not previously known, through John T. Rogers, a reporter for the St. Louis Post-Dispatch, whom he had known for several years; that he had a telephone conversation with Richards about four o'clock that afternoon in which he told Richards that the arrangements were all right; that in this conversation he arranged for a meeting with Richards at Levinson's office at ten o'clock Tuesday morning, November 10th; that he also asked Richards to see that Berg was taken care of, and he replied: "I will go right away and attend to it;" that Richards met him at his office on the following morning pursuant to this appointment, whereupon he told Richards that he had one thousand dollars that Mr. Berg had requested him to give him; that he then handed Richards that amount in one or two packages and asked him to count the money, saying: "I want to assure you it is not marked in any way—I am not trying to trap you;" that Richards replied "It wouldn't do you any good to try and trap me; if the police question me about it I am going to tell them I represent the Berg family;" that he then said: "The question I would like to ask you, Mr. Richards—Mr. Rogers told me that you told him that the man that pointed out Berg was a man in the fur business; was he a Jewish man?" Richards replied "No, he was not." Levinson testified that he then said: "Rogers tells me you are going to get $11,000 of the $50,000 ransom money," and that Richards replied: "Yes. I wanted more, but we finally agreed upon $11,000.00, so that's what I am going to get and I can use it." Levinson further testified that nothing was said between him and Richards as to what the $1000 was for and that he did not employ Richards; that the price for Berg's release was $50,000, and he gave Richards to understand that this amount would be paid him through Rogers when Berg was released; that he had another conversation with Richards the same afternoon in the course of which Richards said: "Mr. Levinson, you understand if I don't get that money you will be killed;" that he again conversed with Richards about five o'clock in the same afternoon and Richards then told him that Berg would be released at 11:45 o'clock that night at Hamilton

and Roosevelt Place in St. Louis; that Richards wanted to be sure to get the $50,000 before noon on Wednesday because he had to leave the office to go out of town to make the pay-off, and Levinson agreed to arrange that Rogers be in Richards office before noon on Wednesday. Levinson testified that he acted on the instructions contained in Berg's letter to him and paid Richards the $1,000 because of his desire to have Berg returned to his family, and that Berg afterward reimbursed him for this payment.

It is conceded that Berg was released substantially as planned, that Richards was arrested on the following morning before any further payment was made to him, and that no part of the fifty thousand dollar ransom was ever paid.

It developed in the course of Levinson's testimony that after his first contact with respondent he felt he was very closely allied with the kidnapers and without respondent's knowledge he conferred with the city police. He also frankly admitted that he lied to respondent when he told him that he was going to assist him to progress in the practice of law and when he told him that Rogers was in Chicago. Respondent bitterly complains of these matters as professional misconduct on the part of Levinson affecting his credibility as a witness. He also intimates that Rogers' testimony, insofar as it conflicts with his own, should be disbelieved because he was out to make a "scoop" for his newspaper and would probably receive extra compensation therefor. It is an ancient custom of persons accused of wrongdoing to impugn the acts and motives of their accusers. In this proceeding we are not called upon to determine the fitness of Levinson to practice law, or to criticize the professional ethics of Rogers, or to pass judgment upon the means used by them to save Berg from bodily harm and effect his release. At least it can be truthfully said of them that there is no evidence that they were in any manner allied with the kidnapers or attempted to serve two masters for gain. Though respondent and his counsel exercised their full privilege of cross-examination and impeachment we find nothing in the record casting doubt upon the truth of the testimony of these witnesses.

The admissions and principal evidence in this proceeding have been thus set forth with particularity because of their unusual character. Other evidence taken by the commissioner was mainly in the identification of exhibits referred to by the witnesses. The record speaks for itself. If the testimony of Levinson and Rogers is worthy of belief, and we are well convinced that it is, respondent is guilty of enough of the charges set forth in the complaint to justify his removal from the practice of law in this State. According to respondent's own admissions he accepted a retainer fee of $1000 from Berg for legal services to be rendered in procuring his release, with good reason to believe that his employment was being dictated by the kidnapers and was not the voluntary act of Berg, and that he

used this situation to coerce an agreement to pay an additional contingent fee of $10,000. However, the clear and convincing weight of the evidence is that there was no agreement that he would be paid a contingent fee of $10,000 by Berg as his attorney, but that he accepted this payment of $1,000 with the assurance that upon Berg's release he would be paid the ransom of $50,000 indicated by the note payable to his order for that amount which Berg had signed under compulsion and which he had received by special delivery letter from the kidnapers, notwithstanding he had previously agreed with the kidnapers that he should retain $11,000 of the ransom money as compensation for his services to them. His admissions to this effect, testified to by both Levinson and Rogers, are corroborated by his own unexplained choice as "pay-off" man by the kidnapers, as well as by his intimate knowledge of their movements and identity disclosed in his conversations with Rogers and Levinson. The apparent naivete of respondent's claim that in all that he did he was acting solely as Berg's attorney without any knowledge or intent of aiding and abetting the kidnapers is belied by the legal knowledge and intelligence displayed by him throughout these negotiations.

It would serve no good purpose to enlarge upon the obvious gravity of respondent's offense. It is hard to think of a practice more devastating to right standards of an honorable profession or more hostile to the public good. According to all the decisions such conduct renders an attorney unfit to engage further in the practice of law. An order of suspension would be inadequate. Under the evidence respondent should be removed from the practice of law in the courts of this State and his license to practice law in this State revoked. It is so ordered. All concur.